ELIAS. STEENERSON v. GREAT NORTHERN RAILWAY COMPANY.[1]

October 20, 1897.

Nos. 10,402—(69).[2]

| 69 | 353 |
| 71 | 529 |
| 69 | 353 |
| f76 | 484 |
| 69 | 353 |
| f80 | 194 |
| 80 | 195 |
| 80 | 202 |
| 80 | 204 |
| 80 | 205 |

**Railroad Commission—Reduction of Rates—On Entire System.**

Under chapter 10, Laws 1887, as amended by chapter 106, Laws 1891, the state railroad and warehouse commission, when reducing rates on the complaint of any one that rates between certain points on a certain railroad are too high, may, for the purpose of preventing discrimination by its own acts, reduce the rates on the whole line or system.

**Same—Reasonableness of Rate—Test.**

The question whether the rates for transportation fixed by the state railroad and warehouse commission are unreasonable and confiscatory is not determined by the fact that the income under the rates as so fixed will not pay the amount of the fixed charges of the railroad. Neither can the amount at which the railroad sold years ago on mortgage foreclosure sale be taken as the basis on which to determine what are reasonable rates, but that question is determined by ascertaining what, under all the circumstances, is a reasonable income on the cost of reproducing the road at the present time.

**Same—Burden of Proof as to Reasonableness.**

Under said chapter 10, as so amended, the burden is on the railroad company to show that the rates fixed by the commission are unreasonable.

**Same—Power of Court on Appeal from Commission.**

Held, the fixing of rates is a legislative or administrative act, not a judicial one, and under the constitution the court cannot place itself in the shoes of the commission, and try de novo the question what are reasonable rates; and on appeal under said statutes the court can review the acts of the commission only so far as to determine whether the rates fixed by it are unreasonable and confiscatory, and to what extent, in much the same

[1] Reported in 72 N .W. 713.          [2] October, 1896, term.

69 M.—23

manner as an appellate court determines whether or not the verdict of a jury is excessive, and to what extent.

### Same—Judicial Notice.

On appeal from the commission the court should take judicial notice of all those general matters of which the commission should have knowledge, and on which it would act without proof thereof made on formal hearing.

### Same—Evidence as to Cost of Reproducing Great Northern Railway.

Evidence examined in the light of the court's findings, for the purpose of ascertaining what it would cost to reproduce the terminals of the Great Northern system at Minneapolis and St. Paul, and what it would cost to reproduce the rest of the lines of that system within this state.

### Same—Reasonable Income on Cost of Terminals.

Where the market price of urban or suburban property in or near a rapidly growing city is higher than is warranted by any annual income which can be obtained from any use to which the property can at present be put, and such excess in market value is caused by the anticipation of still higher prices in the future, *held*, a reasonable annual income on the cost of reproducing railroad terminals out of such property is less than a reasonable income on the cost of reproducing other portions of the road, which, when reproduced, are not likely to increase in value. *Held*, the public, and not the courts, must be the judge of whether or not such property will increase in value in the future, and, if so, how much. What is the lowest rate of annual income on the cost of reproducing such terminals in Minneapolis and St. Paul, which the courts would uphold as not being confiscatory, is not decided; but it is *held* that a net income of 2½ per cent. per annum in 1894 on such cost is, under the circumstances, a liberal income.

### Same—Reasonable Income on Railroad Property Other than Terminals.

The great fall in the last few years in rates of interest, and in what are reasonable rates of income on capital invested, noticed, and the reasons for such fall stated. *Held*, a net income of 5 per cent. in 1894 on the cost of reproducing all of said railroads except the terminals was not, under the circumstances, unreasonable or confiscatory.

### Same—Apportionment of Earnings on State and Interstate Traffic.

The railroad lines in question extend beyond the state, and, for the purpose of determining the net earnings of the part of the lines within this state, the different methods proposed by counsel for apportioning the gross earnings among the states are considered. *Held*, the gross earnings on the through traffic extending across this state and into other states should not be apportioned on the "mileage basis," as that would give Minnesota the

benefit of the higher rates which the carrier is entitled to charge in·the more thinly-settled country further west, where the traffic is lighter. *Held*, further, such gross earnings cannot be apportioned on the theory that the patrons of the part of the lines within this state are not entitled to the benefit which should naturally come to them from the fact that just beyond the borders of this state there is a large area of fertile territory which furnishes a large amount of railroad traffic, which co-operates with similar traffic within this state to make reasonable rates lower than they otherwise would be; and a railroad which extended from St. Paul and Minneapolis or Duluth to the west line of the state, and there terminated, without connections or feeders beyond, would not be an enterprise planned or conducted on business principles.

## Same—Unprofitable Feeders or Extensions.

When any feeder or extension, portion of a railroad line or system, is an incumbrance on the rest of the line or system, so that the rest of the line or system would at the same rates produce more net income if such portion did not exist (that is, if all the gross earnings on all the traffic passing over such portion, and on the whole length of the haul on such traffic, will not pay the operating expenses on such traffic for the whole length of such haul, and pay for the wear and tear on the line or system caused by such additional traffic, and also pay a reasonable income on the cost of reproducing such portion of the line), and these conditions are not of a temporary character, but are the result of building the feeder or extension where there was not sufficient business to justify its existence, then such portion of the line is not self-supporting, but is an incumbrance on, and not a feeder of, the rest of the line or system, and, in determining what are reasonable rates for the rest of the line or system, such portion may be rejected. *Held*, under the statute, the burden was on the railway company to show that the western portion of its line was self-supporting.

## Same — Burden of Proof as to Apportionment of Earnings on State and Interstate Traffic.

*Held*, under the statute, the burden was on the railway company to show what portion of the gross earnings on through business should be apportioned to Minnesota; that it failed to maintain this burden, and on the evidence, therefore, failed to prove that the rates fixed by the commission are confiscatory.

## Same—Evidence as to Cost of Reproducing Railroad.

The evidence examined for the purpose of ascertaining as near as possible the cost of reproducing the whole of the lines and terminals, and *held*, that the income on the same in 1894, with the rates as reduced by the commission, would produce 2½ per cent. net income on the cost of reproducing the terminals, and 5 per cent. net income on the cost of reproducing the

rest of the road, and that, under the circumstances, the same is a fairly liberal income.

**Same—Profit on Business Enterprises Controlled by Railroad—Burden of Proof.**

There are a number of feeders and portions of railroad lines which are separately incorporated, but which in fact form parts of the railway system of the Great Northern Railway Company. There is also a steamship line on the Great Lakes, and a very valuable coal mine in Montana, each of which is separately incorporated. All or nearly all of the stock of each of these other corporations is owned by the Great Northern Railway Company, and it or its officers manage and control all of these other corporations. The profits of each of them depend almost wholly on the division of profits on business in which it and the Great Northern Railway Company are jointly concerned, and such division is a mere matter of bookkeeping. Some of these other corporations appear by the reports of the Great Northern Company to have made very large net profits during the year in question. *Held*, the burden was on the Great Northern Railway Company, in this case, to show that the division of profits between it and these other corporations was fair and reasonable, and it failed to maintain that burden.

The plaintiff, Elias Steenerson, in 1893 filed a complaint with the Railroad and Warehouse Commission, complaining that the tariff of charges of the Great Northern Railway Company for the transportation of wheat, oats, barley and other grains from Crookston, Fisher and East Grand Forks, to the terminals Minneapolis, Duluth and St. Paul, were unjust and unreasonable, in that they were at least one-third too high, and asked that the same be reduced to and fixed at 12 cents per hundred pounds between Crookston and either of said terminals, and between other stations on said railway and said terminals in proportion, or to a just and reasonable rate. The defendant company made answer to such complaint, admitted the existence of charges as alleged in the complaint, and alleged that its rates and charges, "including those in question," were in all respects reasonable and just.

A hearing was had in the matter by the said commission, whereupon an order was made September 8, 1894, reducing and fixing the rates in the manner shown by a schedule prepared by the commission. Thereupon an appeal was taken by the Great Northern Railway Company to the district court of Ramsey county.

When the matter came on for hearing in that court, the Northern Pacific Railroad Company and its receivers petitioned to be allowed to intervene therein on the ground that the said two railroad companies are competitors in the same territory; that both have lines extending from Crookston and the other places named in said complaint to Duluth, Minneapolis and St. Paul; that the grain grown along the lines of said roads can be marketed with equal facility in the market towns on either of said roads, and especially so upon the parallel lines running north from Winnipeg Junction, Fargo and Glyndon; that if the rates then in force upon the Great Northern Railway be reduced, "the grain can be hauled by the farmers and marketed on its line instead of upon the lines of the Northern Pacific railroad, and thereby the Northern Pacific Railroad Company and its receivers will be greatly damaged and injured in its business and occupation of common carrier, and thereby lose a large amount of freight which would otherwise be carried on the line of intervenors' road." Intervenors further alleged that the rates thus existing upon the said two roads between the said points for the said commodities were the same; and, furthermore, that the affairs of the said Northern Pacific Company were in the hands of receivers, and certain mortgages upon the properties were being foreclosed, "because of the inability of said company, on account of loss and failure of earnings of its said line and system of railroads, to meet and pay the interest on the said mortgages as the same has accrued."

Notwithstanding the objections of the plaintiff the court permitted the Northern Pacific Company to intervene and to introduce testimony in support of the allegations of its complaint in intervention.

On September 28, 1895, the court, Charles D. Kerr, J., filed its order reversing the order of the commission. A motion for a new trial was duly made in behalf of the commission and of the state, which was argued before Willis, J., on account of the illness of Judge Kerr, and from the order denying this motion, Elias Steenerson, the state of Minnesota, and the Railroad and Warehouse Commission appealed. Reversed.

*H. W. Childs*, Attorney General, and *Clapp & Macartney*, for appellants.

1. The view contended for by the trial court, that in determining the reasonableness of the rate the present value of the railroad property must be taken as the basis, is not supported by judicial authority; neither do we think it consistent with the logic of the situation. Just what constitutes the basis of a reasonable rate never has been and probably never will be fairly and clearly stated in any one single proposition. But among their elements must be business conditions and business principles. Now, it is the uniform history of rates that, as a country developes, rates are decreased, principally on account of competition; yet, at the same time properties actually become more valuable. Take the same acreage of terminals in St. Paul and Minneapolis 20 years ago and to-day, and they would be much more valuable now than then. So it is seen at a glance that, subject to the laws of business, rates do not keep pace with the growth in the value of the railroad properties, but decrease as the properties become more valuable. That the present value of the railroad property is not the basis is determined by Judge Brewer in the Reagan case, 154 U. S. 362, 412. This disposes of the rule as an arbitrary rule that the present value of the road is to be taken as the basis, and also disposes of the rule as an absolute rule that the obligations of the company are to be taken as a basis. See, also, Dow v. Beidelman, 125 U. S. 680.

2. As to the transaction out of which grew the Great Northern issue of stock, we shall insist that, for the purposes of this case, the Great Northern Company and the Manitoba Company are practically one and the same thing,—the stockholders of the Manitoba,—and that neither does the contract purporting to have been made between these companies, but in fact made by the stockholders themselves through their respective representatives, nor does the stock issued by the Great Northern, amount to a factor in determining what is a reasonable rate. That upon that branch of the inquiry, as to the reasonableness of the rate, the only question is, how much have these people actually invested in the railroad property?

3. As to the division of state and interstate earnings, we insist that the true rule is the one adopted practically by the companies themselves, i. e., to divide the interstate business upon a mileage basis, count all cost of operation in Minnesota and fixed charges that are properly chargeable to Minnesota mileage, and set against this all earnings in Minnesota, both on local business and on the interstate business done in Minnesota.

4. We have made no reference, in this brief, to the Northern Pacific, because we believe the public, in fixing a rate on Great Northern traffic in Minnesota, is only required to consider what is a reasonable rate for the Great Northern to charge on Minnesota traffic.    Ames v. Union, 64 Fed. 165, 172; Steenerson v. Great Northern, 60 Minn. 461.    It seems too plain to admit of discussion, that if the rate fixed by the commission for the Great Northern is a reasonable rate, its enforcement cannot be restrained simply upon the ground that it would not perhaps be a reasonable rate if fixed by public authority for the Northern Pacific.

5. The trial court failed to find what would be a reasonable rate on the ground that it had no authority to modify the rate.    The error of the court was in following the suggestion that determining the fact what is a reasonable rate, under an act declaring that rates shall be reasonable, was equivalent to enacting a law, instead of being merely the determination of a fact.

*M. D. Grover,* for Great Northern Railway Company.

1. The state contends that the value of the property of the Great Northern as a basis for earnings is the amount of the cash bids on the foreclosure sales in 1879, when the Manitoba Company acquired the property of the St. Paul & Pacific Company and of the First Division Company, and that to this amount should be added what has been expended in the acquisition and construction of additional mileage, equipment, and appurtenances.    It is not disputed that the Manitoba Company acquired title to all of the properties, nor that it succeeded to all the rights and franchises of the old companies.    This much being admitted, yet it is contended that, as a purchaser, it did not become entitled to the full enjoyment of the fruits of its purchase.    Suppose the old companies had made

a gift of all their properties to the Manitoba Company, or the owners of all the stock of the old companies had made a gift of it to the Manitoba Company, would it have become the owner of the property and entitled to its full enjoyment, or would the people of the state of Minnesota have acquired the title, and, because of the gift, the authority to deprive the Manitoba Company of its right to use and operate the property at rates which would yield to it a reasonable return upon its cost or value?

2. The traffic of the company is divisible into three classes: A. Traffic both originating and terminating within the state. B. Traffic originating within the state and terminating outside of the state and vice versa. C. Traffic originating or terminating outside of the state, i. e., moving across the state in transit. It is needless to remark that the regulating power of the state is confined to traffic of the first class. All traffic of the second and third classes is either commerce between states or between the state and a foreign country, and in either case is beyond the state's control. Traffic of the first class, having its movement wholly within the state, forms a very small percentage of the traffic moving upon the railways of the Northwestern states. This is true of the traffic of the state of Minnesota, but the company in this case has not objected to an examination of its movement of traffic of all kinds. In fact, its traffic between the Dakotas, Montana, Idaho and Washington and the states east of Minnesota is so large a proportion of the whole that, for the purposes of illustrating its position in this case, it has only attempted to separate the third class of traffic, that is, traffic moving from without across the state, leaving the first and second classes to stand together as strictly state traffic. In the evidence and argument only such traffic as moves across the state is regarded as interstate traffic. State traffic includes not only that beginning and ending in the state, but also that beginning in the state and passing through its terminals, including St. Paul, Minneapolis, and Hinckley, out of the state, and from points without to points within.

3. As to the division of interstate earnings. The earnings of the line, as an entirety, were shown, and are to be taken into account in determining the question of the reasonableness of local earn-

ings.  A case may arise where local rates will be held to be unreasonable by reason of the fact that unprofitable lines outside of the state are supported therefrom.  An investment in extension of a local line outside the state may not, at first, prove helpful to the state, but may, in the end, prove very advantageous.  No such question arises in this case, because the line outside of the state, under a proper division of earnings, has been self supporting, and has also contributed a considerable net income to be added to local earnings.

A division of interstate earnings in the proportion that the number of miles traversed within the state bears to the number of miles traversed outside the state would yield a net income upon the cost of the road or investment in the state of over 8 per cent., but would leave a large deficit outside the state.  Should it be held that a net revenue yielding 8 per cent. on cost of property in the state is too much, and should a reduction be made for that reason, the company would, in a short time, become insolvent.  An income of 8 per cent., under a mileage division of interstate earnings, upon the cost of line in the state, cannot justly be held to be unreasonable,. if such income has grown out of interstate earnings and would not have been realized but for such earnings.  Unless it appears that the patrons of the line in the state have been unjustly burdened by the rates they have paid, local rates should not be reduced, because the total earnings on local interstate traffic upon an arbitrary mileage division have yielded a large per cent. of revenue upon the amount of investment or cost of the property in the state.

Upon a correct division of interstate earnings, the net income of the line in the state of Minnesota has not been sufficient to pay the interest charge upon the bonded indebtedness of the line in the state amounting to $19,000 per mile.

A question is thus raised as to what proportion of interstate earnings should be regarded as local earnings for the purpose of determining the question of the reasonableness of local rates.

A railroad company in making its investment must take its chance of competition and business conditions.  Here the state proposes to deprive the company of a part of its income, which

under all business chances it has been able to earn, upon the ground that it is earning too much in the state; in other words, is charging its patrons in the state more than it ought to charge for the service it renders them. The company contends that it can earn nothing in this state, on account of interstate traffic, until it has first paid from such traffic the cost of collecting, handling and transporting it to the state line. The state contends that the matter of such cost is to be disregarded, and the receipts from interstate traffic are to be arbitrarily divided; that there is to be credited as having been earned in the state such a proportion of the receipts as the mileage traversed in the state bears to the mileage traversed outside.

The Manitoba Company had a right to stop at the state boundary line with its railway; had it done so it would have had a right to collect from the people of the state using its road a fair yearly percentage upon the cost or reasonable value of the property. To do this it would have had a right to make such tariffs as would, after the payment of operating expenses, and the maintenance of its property, including a reasonable sinking fund for depreciation, yield a net revenue in an amount sufficient to afford a reasonable percentage of return upon the value of the property. But the company constructed an extension of its line to Puget Sound, and to several points in North and South Dakota. Its road is well built, and well equipped; it runs into a territory which already furnishes a large amount of traffic, and which, in the near future, will be largely increased. The nature of the traffic reached by the extension of its line has been such that a large part of it, in order to reach its destination, must be transported across the state. No burden has been imposed upon the state by such extension of its lines; on the contrary, the state has been benefited. Have the relations of the company to the people of the state of Minnesota been in any way changed by reason of the construction of extensions of its line? When the line of the company reached the western boundary of the state, it had equipment enough and terminals sufficient to handle the traffic of the people of the state, and more traffic than could be procured within the state. It was the right and duty of the company to make provision for the future. In-

dustries in the cities are so located that it requires a large number of spur and side tracks to reach them, and extended yard facilities in which to store and handle cars. To secure additional traffic for its road in this state would be advantageous for all concerned. A railroad is supported wholly by its patrons, it has no source of income except what it earns when its cars are moving.

4. The cost to a railroad company of carrying freight and passengers consists of two elements. A. Providing the road; · its equipment, appurtenances and terminals. B. The movement of freight and passengers with the instrumentalities it has provided. The first of these two elements is constant and unvarying, no matter what may be the volume of traffic. The cost of the line in this state is no greater or less, whether one million tons or five million tons per year move over it. As to the second element, the moving of traffic over the road, there is a cost in connection with the movement which is constant. When an engine and caboose are set upon a track ready to move and the train crew has taken its position, practically the entire expense has been incurred by the company, if not a pound of freight is moved. Excepting a small amount of fuel, it costs as much to run a train unloaded as to run a train hauling many tons of freight. The cost of handling interstate traffic in a state upon a line where trains must run to accommodate local traffic, and which is transported in trains with local traffic, adds but little to the cost of moving such local traffic. When the company extended its lines into the states west of Minnesota, it did what was advantageous to itself and to the people of the state. If, by doing this, the volume of traffic moving across the state is increased, the operating expenses of the train in which the traffic is moved would be divided, and the burden upon the people of the state lessened. Additional terminals are not required, at least to any great extent, the additional wear upon the track and consumption of coal is slight, and the revenue from the traffic is considerable.

The road is well located, and has been economically managed and constructed. The gross earnings from interstate business can be known with practical accuracy, and the amount of such earnings was proven. The cost of moving the traffic was shown. This

cost necessarily consisted of the two elements above mentioned, that of providing the road, which is represented by the interest upon the bonds and dividends upon the stock, the bonds and stock being no more than the fair cost of the property. Added to this is the expense of moving the traffic over such line to the boundary of the state. It was not claimed upon the trial that greater earnings could have been made from this traffic, nor that the cost of handling it could have been reasonably less. Subtracting from interstate earnings the cost of acquiring and handling traffic, it was found there remained, as net earnings in the state of Minnesota, but $158 per mile, or a little over $200,000. The ton mileage of this traffic within this state was about half of the total ton mileage in the state. This large ton mileage came not so much from the large number of tons as from the fact that all the tons reached the western or eastern boundary of the state in full car loads, and were hauled entirely across it. In this respect, interstate traffic differs very much from the state traffic. The latter consists of tons gathered at points along the entire system in this state, and the average haul of such tonnage is not more than one-half that of the tonnage comprising interstate traffic. The company asserts in this case that the people of the state of Minnesota cannot get more out of interstate traffic than the company is able to get out of it. To hold otherwise, and as the state contends, would be to require the company to pay to the people of Minnesota a premium for doing interstate business at a loss. If more than the actual gain to the company from interstate traffic, after paying the expenses of transporting it to the state line, is to be added to its earnings local to the state, the company will be financially ruined, because of the extension of its lines, though the extension of such lines has been in every respect advantageous to the people of the state.

5. The rates complained of are not unreasonable. It is impossible to recognize a state line in making a tariff of rates. Such tariff must be made with reference to contiguous territory, whether divided by a state line or not. Any decrease of rates on the Minnesota side of the Red River must be followed by a decrease upon the Dakota side. If the rates charged from Crookston are too high, the rates charged from Dakota are too high. Under the rates in

force when the complaint herein was filed, the company was not earning more than it was entitled to receive on account of the investment in the state of Minnesota.

6. A sinking fund or annual accumulation is necessary to make replacements or renewals of track not included in the current expenditures of repairs and maintenance. Everything except the earth-work connected with a railroad has a more or less well-known fixed period of durability. Ties last about eight years; all structures of wood, such as bridges and culverts, about the same time. The life of steel rails of present manufacture and weight is not known, but of the older class it is about 15 years. Cars wear out and after a period of repair become useless. So do locomotives. Current repairs go into operating expenses from year to year. Such repairs represent the accidents of the year or the wear of the year, but do not represent the constant decay which, in the end, utterly destroys the thing. If a capital account is not reserved out of the earnings to make good necessary renewals when repairs can no longer be made, a company will become bankrupt upon the occurrence of the period requiring general renewals.

7. The rates complained of are low in comparison with the rates on the Union Pacific Company into Omaha and on the lines of the various railways running from the west into Chicago.

8. The order is destructive to competition. Under the order of the commission the rate from Crookston to Duluth is two cents per hundred more than to Minneapolis; from Fisher 1.4 per hundred more; from East Grand Forks 1.5 per hundred more. Minneapolis and Duluth are the principal markets for grain in the states of Minnesota and North Dakota, and nearly all grain grown on the lines of the railroad companies, respectively, is marketed at those two places, and can be so marketed from Red River points by way of the line of the Northern Pacific or Great Northern Company with equal facility. It is advantageous to the producer and shipper that the freight rates on grain from the points of shipment to the markets of Duluth and Minneapolis be the same. The distance on the line of the Northern Pacific Company to Duluth and Minneapolis is the same; on the line of the Great Northern Company the distance to Duluth is about 70 miles greater than to Minne-

apolis. The Great Northern must, therefore, disregard the order and carry to Minneapolis and Duluth at the same rate, or it will lose business at all points where it competes with the Northern Pacific Company. It cannot lawfully increase the rate fixed by the order on business to Minneapolis.

9. As to the jurisdiction of the court. Maximum rates may be fixed by legislative act. The legislature may delegate to a commission the right to make an order fixing the maximum rates. Upon an appeal from an order of the commission, it is the duty of the court to examine the matter, not only as to the facts, but as to the law, and to affirm or reverse the order. No rates were complained of except grain rates from Crookston, Fisher and East Grand Forks. The commission had authority to pass upon the question raised by the complaint and no other. The jurisdiction of the court is limited to questions raised by appeal from the order of the commission. If the order appealed from is not a tariff, and the court so found, the court was not called upon and had no authority to make a tariff. Reagan v. Farmers, 154 U. S. 362; Chicago v. Dey, 38 Fed. 663.

10. What is an unreasonable rate when imposed by the state through its legislature or commission? A railroad company acquires money with which to construct and equip its railroad by the issue and sale of stock or bonds, or both. This it is authorized to do under a charter granted by the state, which constitutes a contract between the company and the state, and under which the company is assured that it may construct its railway, and maintain rates sufficient to yield earnings that will pay operating expenses, maintain the property, and return a reasonable income upon its investment. In making the investment the company takes a business chance; that is, chance of competition and of changes in business and of economic conditions. No one underwrites its stock and bonds, and it is given no guaranty of a fixed amount of income. Charged with a public duty in consideration of privileges granted, it must afford reasonable facilities to the public, and render service at reasonable rates. Interstate v. Baltimore, 145 U. S. 263. As to the relative power of the legislature and courts in regard to fixing reasonable rates, see Spring v. Schottler, 110 U. S.

347; Railroad Com. 116 U. S. 307; Chicago v. Minnesota, 134 U. S. 418; Reagan v. Farmers, supra; Ames v. Union, supra; In re Investigation, 3 Inters. Com. 101.

*C. W. Bunn* and *Frank B. Kellogg*, for Northern Pacific Railroad Company.

1. We thought that in this case, to a great extent, the court would have to take into consideration the entire line of road of the Northern Pacific as well as the Great Northern, for the reason that a large amount of the income is derived from interstate business. It appears by the sworn report of the Northern Pacific road for the year 1894, made pursuant to law and published by the railroad and warehouse commission, that its bonded indebtedness is $163,-998,500. The report of the railroad and warehouse commission is prima facie evidence of this fact. 26 Am. Law Rev. 390; Clemens v. Meyer, 44 La. An. 390; People v. Williams, 64 Cal. 87; Clark v. Williams, 29 Neb. 691; People v. Kemp, 76 Mich. 410; Thurstin v. Luce, 61 Mich. 486; Richmond v. Dubuque, 40 Iowa, 264; 7 Am. & Eng. Enc. Law, 76; Joint v. Lyford, 27 Wis. 506; 1 Rice, Ev. 30; State v. Braskamp, 87 Iowa, 588.

2. As to the effect which should be given to the testimony of the Northern Pacific Company offered in this case, see Steenerson v. Great Northern, 60 Minn. 461, 474. We apprehend from this decision, and from the nature of the questions before it on that appeal, that it was proper for the court below to take into consideration competing lines, the cost of these lines, the value of the road at the present time, what is a reasonable rate over the competing line necessary to its operation, number of competing lines, extent of the traffic, rates over other lines in other states similarly situated, and many other things, in order, on broad grounds, to arrive at what is a fair and reasonable rate for performing the public service. Texas v. Interstate, 162 U. S. 197, 233; Interstate v. Louisville, 73 Fed. 409, 419; Phipps v. London, 2 Q. B. (1892) 229, 242.

3. As to the power of the court to fix a schedule of rates, we believe it is now thoroughly settled that the power of the legislature and of the commission is subject to a judicial investigation as to whether the particular rate fixed is reasonable or unreason-

able. Reagan v. Farmers, 154 U. S. 362; Chicago v. Minnesota, 134 U. S. 418, 458; Cincinnati v. Interstate, 162 U. S. 196; Interstate v. Cincinnati, 76 Fed. 184; State v. Sioux City, 46 Neb. 682; Texas v. Texas, 6 Fed. 426; Atchison v. Denver, 110 U. S. 667; Pullman v. Missouri, 115 U. S. 587; Express Cases, 117 U. S. 1; Little Rock v. St. Louis, 41 Fed. 559; Kentucky v. Louisville, 37 Fed. 567. The power of the court is judicial. Fixing rates and schedules is administrative. One does not necessarily include the other. The court may easily come to a conclusion that a certain rate is unreasonable as fixed by the commission, and at the same time it may not be proper for the court or competent for it to go on and fix a schedule of rates. See State v. Sioux City, supra. The power to fix rates is legislative and administrative. State v. Chicago, 38 Minn. 281; Reagan v. Farmers, supra; In re Interstate, 53 Fed. 476; Interstate v. Cincinnati, 76 Fed. 184; Interstate v. Brimson, 154 U. S. 447, 474; Forsyth v. City, 18 C. C. A. 175; State v. Simons, 32 Minn. 540; In re Village, 93 Wis. 616; United States v. Ferriera, 13 How. 40; Gordon v. U. S., 117 U. S. 697; In re Sanborn, 148 U. S. 222.

*C. W. Bunn,* for Northern Pacific Railroad Company.

1. Counsel for appellants argue that the courts have power, on appeal from the commission, to fix railroad rates. The fixing of a rate is primarily a legislative or administrative function. The only judicial question involved is that the legislature or commission has no power to fix a rate unreasonably low. Judicial power extends only to the restraint of the legislative power within the limits of the law. Chicago v. Minnesota, 134 U. S. 418.

2. For the purpose of showing that the railroad companies are earning so much in Minnesota that the reduction of wheat rates ordered by the commission would not deprive them of reasonable earnings within this state, counsel for the appellants are compelled to stand on the proposition that the Minnesota earnings are to be determined by taking such a proportion of the earnings of through business as the Minnesota mileage of road bears to the total mileage.

This proposition is radically and essentially unsound. It is

clearly immaterial that the railroads have adopted such apportionment in their returns to the state under the gross-earnings tax law. The proposition advanced ignores all consideration of difference in original cost of the railroad, difference in price of supplies and materials, difference in cost of fuel, difference in wages of labor, difference in grades, difference in size of train loads, difference in volume of traffic, and difference in cost of maintenance and operation, between the lines in the state and the lines outside of it. It is a well-known fact, found by the district court, that the cost of moving a ton of freight one mile is in fact considerably greater on the western portions of the road than in Minnesota. Indeed, it needs no finding to show to this court that through the mountains, with high grades, with expensive labor, with high prices for material, with comparatively small business and sparse settlement, with short trains and few of them, it costs much more per mile to move freight than it does within the state of Minnesota. If the principle contended for is sound, it would have to be applied, whether the carrier outside the state which brought the freight to the state line were a railroad company, a steamboat line, or a wagon train. If the freight were brought to Fargo, for example, 500 miles up the Red River by steamboat, counsel would be forced to contend that the earnings of the railroad from Fargo to St. Paul would be a proportionate part of the through rate over both lines, based on the comparative mileage of each.

The whole question is whether counsel can charge the Minnesota lines with earnings which they do not earn, for the purpose of showing that Minnesota rates ought to be reduced. As Mr. Clough well says in his testimony, if $100 is the through rate, and it actually costs $75 to bring the freight to the Minnesota line, all that is left for the Minnesota line to earn is $25. It is absolutely impossible for it to earn any more. It is not contended that any losses of the road in other states could be deducted from the earnings in Minnesota in the consideration of the question of local rates in Minnesota. But where it appears, as in this case, that the operation of the lines outside the state is made to contribute largely to earnings within the state, and so as to enable the company to reduce local rates, the whole business of the company must be con-

69 M.—24

sidered where it is sought to determine how much is in fact earned in Minnesota. And the whole business must be divided on a fair basis, on a basis of fact, having regard to the actual earnings made in Minnesota, on through business, and not on a purely arbitrary and fictitious basis, having no foundation in fairness or in fact.

3. It is important in this case, as in every case involving the reasonableness of railroad tariffs, to understand what is meant by the term "a reasonable rate." It is not our purpose to assume the difficult task of giving an exhaustive definition to this term, but simply to call attention to one or two of the fundamental things which the term involves.

If a railroad is built and operated wisely and economically; if it is located where public need requires it, where there is business to justify its existence, and constructed so as to be fit and well adapted for the business which it aims to accommodate,—it should be entitled to return as good interest as capital invested in the average of other lines of enterprise. This statement seems so obviously true as to command at once universal assent, and yet it involves a great deal, and may serve to explain and reconcile language in the decisions which might at first blush appear to be contradictory. In private business the proprietor fixes his own prices, subject to no control by law; while in the case of railroads the law assumes to fix their rates, and at the same time to compel the continued operation of the roads, and prevent the owners from withdrawing their capital and devoting it to other and more profitable uses. This justly gives the railroads a corresponding right to insist that rates shall be fairly remunerative.

We are under no necessity of determining, in this case, whether the right to earn a reasonable return has reference to the stock and bonds of the company outstanding, or has reference to the fair value of the property, or to the cost of reproducing it. For it is proved beyond all question, and it is found by the district court, that the Great Northern lines in Minnesota could not be reproduced for less than their present capitalization; and that the capitalization represents actual value. It becomes unnecessary, therefore, to reconcile, for the purposes of this case, all that has been said in various decisions, the language of some seeming to refer to

the cost of the property to the owners, the language of others seeming to refer to the capitalization, and of others still to the cost of reproducing the property. Such language has been used in each case with especial reference to the facts of that case, and should be so interpreted. It is certain, at the least, that where a road is wisely located and economically built, its fair value cannot be fixed at any sum below both what it has cost to produce and what it would cost to-day to reproduce. A reasonable rate, as applied to such a road, certainly means, at the least, a reasonable income on its fair value, and its fair value cannot be less than it would now cost to duplicate it.

CANTY, J.

1. Chapter 10, Laws 1887, as amended by chapter 106, Laws 1891, provides that in fixing rates of transportation the state railroad and warehouse commission may act upon the complaint "of any person, firm, corporation or association, or any mercantile, agricultural or manufacturing society, or any body politic or municipal organization." It further provides:

"If the tariff of rates, fares, charges and classifications so complained of shall be found by the evidence to be unequal or unreasonable, the commission shall state wherein they are unequal or unreasonable, and shall make a tariff of rates, fares, charges and classifications which shall be substituted for the tariff complained of." [3]

Steenerson appeared before the commission, alleged that he was engaged in shipping grain over the railroad of the Great Northern Railway Company from the stations of Crookston, Fisher, and East Grand Forks to Minneapolis and Duluth, in this state, and that the rates between these points were too high. After summoning the railway company and having a hearing as provided by the statute, the commission made an order reducing rates on grain on all the lines of the railway company within the state. From this order the railway company appealed to the district court, and after a hearing on the appeal the court reversed the order of the commission. From the order of the court the attorney general appeals to this court.

[3] G. S. 1894, § 386, subd. e.

It is contended by counsel for the railway company that under the statute the commission had no authority to go beyond the relief asked for in the complaint, or to reduce rates between points not named in the complaint. We cannot agree with counsel. It is the duty of the commission, when reducing rates as prayed for in such a complaint, to see that its acts do not result in discrimination as against other points on the line or system not named in the complaint. The statute which makes it the duty of the commission to prevent discrimination, when complained of, clearly intends that the commission shall not itself create such discrimination. And, in order to avoid doing so when reducing the rates complained of, it may be necessary to reduce rates between all other points on the line or system. The complaint made in such a case is not at all analogous to the bringing of an action by a private suitor to redress a private grievance. The complainant before the commission need have no direct or immediate interest in the matter, and, even if he has, he is acting on behalf of himself and the rest of the public.

2. Of the lines of railroad here in question, 561 miles were built for and owned by other railroad companies prior to the foreclosure sales of 1879. At one of these sales the promoters of the St. Paul, Minneapolis & Manitoba Railway Company bid off a part of the property; and the company itself, after it was organized, bid in the rest of said property. These properties, the franchise connected with the same, and a large land grant, earned and to be earned, were bid off for the aggregate sum of $3,600,000, subject to a prior lien of $486,000. The promoters transferred to the new company the part bid in by them, and the properties were immediately bonded by the new company for $16,000,000, and it issued to the promoters its stock to the amount of $15,000,000. It operated its railroads from 1879 to 1890, during which time it increased its mileage in Minnesota from 561 miles to nearly the present amount of 1,381 miles of main track. It also extended its lines beyond the state into North and South Dakota, and beyond to the Pacific coast. Its stock was subsequently increased to $20,000,000, and its bonded indebtedness now outstanding is $84,558,484. It leased all of its lines to the Great Northern Railway Company for 999 years. By

the terms of the lease, which took effect February 1, 1890, the Great Northern Railway Company guarantied the payment of the principal and interest of said bonds, and guarantied a dividend of 6 per cent. per annum on said $20,000,000 of stock.

At the foreclosure sales of 1879 the 561 miles of main track then built were sold for a small part of their original cost, and a small part of what it would then cost to reproduce them, saying nothing of the large quantity of valuable lands included in the sale. The attorney general contends that the price at which the property sold at foreclosure sale must, as far as it goes, be taken as the basis for determining in this case what is a reasonable income to be derived from the operation of these lines of railroad. On the other hand, counsel for the railway company contend that the amount of the present fixed charges of the Great Northern Railway Company is the controlling consideration in determining what is a reasonable income to be derived from operating the lines so leased by it.

In our opinion, both positions are wholly untenable. If the Manitoba Company and its promoters bought the properties at the foreclosure sales at a great sacrifice, that is their good fortune. If the leasing of the system by the Great Northern Railway Company turns out to be a bad bargain, that is its misfortune. The patrons of the road should not gain by the one transaction or lose by the other. There is as much reason why the public should bear the loss of the bad bargain as there is why it should take the profits of the good bargain. To adopt any such principle would leave the public at the mercy of every railroad manipulator, and offer a premium on all kinds of schemes for increasing the fixed charges of railroads.

Again, in determining what are reasonable rates, it is perfectly immaterial whether the railroad is mortgaged for two or three times what it would cost to reproduce it, or whether it is free from incumbrance. To hold otherwise would be to hold that the state or the public have indirectly guarantied the payment of the mortgage bonds of every railroad. The state may as well guaranty the bonds directly as indirectly. But neither the state nor the public have done either the one or the other. It is immaterial how the

property has been split up into different rights, interests, and claims. For the purpose of fixing rates, the holders of all of these stand in the shoes of the sole owner of the property, unincumbered. The rights of the bondholders are no more and no less sacred than the rights of such an owner. Again, the railroad may have been constructed years ago, when iron rails cost $85 per ton, and everything else in proportion, or it may have been constructed yesterday, when steel rails cost but $16 per ton, and every thing else nearly in proportion. Counsel for the railway company dwell much upon the original cost of the older portions of these lines of road. If a railroad was built 30 years ago at a cost of $40,000 per mile, and another one equally as good was built within a year through the same territory at a cost of $12,000 per mile, on what principle should it be held that the old road is entitled to $3^{1}/_{3}$ times as much income as the new road? No guaranty was ever given by the state to the old road that the price of materials and the cost of construction would not decline, or that capital invested in railroads should not be subject to like vicissitudes as capital invested in other enterprises. Modern improvements and other causes have continued to reduce the cost of construction of all kinds of new plants, and to reduce the value of old plants, or render them wholly worthless, and the state did not guaranty that those causes should not in like manner affect the capital invested in railroads. Then the material question is not what the railroad cost originally, but what it would now cost to reproduce it.

3. Section 8, c. 10, Laws 1887, as amended by chapter 106, Laws 1891, provides:

"Such tariff of rates, fares, charges or classifications, so made by the commission, shall be deemed and taken in all courts of this state as prima facie evidence that the tariff of rates, fares, charges or classifications so made is equal and reasonable." [4]

Then the burden is on the railroad company to show that the rates fixed by the commission are unreasonable, and for this purpose the original cost of the road, the amount of its present fixed

[4] G. S. 1894, § 386, subd. e.

charges, and its history, are material only so far as they show what it would now cost to reproduce the railroad.

4. On appeal from the commission to the district court, on what principles shall the court proceed to review the act of the commission? Section 15 of said chapter 10, as amended by said chapter 106, provides:

"Upon such appeal, and upon the hearing of any application * * * for the enforcement of any such order made by the commission, the district court shall have jurisdiction to, and it shall, examine the whole matter in controversy, including matters of fact as well as questions of law, and to affirm, modify or reverse such order in whole or in part, as justice may require; and in case of any order being modified, as aforesaid, such modified order shall, for all the purposes contemplated by this act, stand in place of the original order so modified and have the same force and effect throughout the state as the orders of said commission." [5]

If by this the legislature intended to provide that the court should put itself in the place of the commission, try the matter de novo, and determine what are reasonable rates, without regard to the findings of the commission, such intent cannot be carried out, as a statute which so provided would be unconstitutional. The fixing of rates is a legislative or administrative act, not a judicial one. State v. Chicago, 38 Minn. 281, 298, 37 N. W. 782. And the performance of such duties cannot, under our constitution, be imposed on the judiciary. Foreman v. Board, 64 Minn. 371, 67 N. W. 207; State v. Young, 29 Minn. 474, 9 N. W. 737; Reagan v. Farmers, 154 U. S. 362, 14 Sup. Ct. 1047.

But it is not necessary to construe this statute so as to render it unconstitutional. It does not by express words, or even by necessary implication, provide that the court shall stand in the shoes of the commission, and try the matter de novo. Under the constitution, the district court may, on appeal to it, review the findings of the commission in the same manner as an appellate court reviews the findings of the jury on a trial in the court below. And for this purpose the court may "examine the whole matter in controversy, including matters of fact, as well as questions of law."

[5] G. S. 1894, § 393, subd. d.

In other words, the court may examine matters of fact to ascertain whether there is any evidence reasonably tending to support the findings of fact disputed, and may examine questions of law arising on the facts conceded. It seems to us that this is, then, the proper interpretation of this somewhat vague and obscure statute, and the only interpretation which will render it constitutional. While the district court takes the evidence de novo, it cannot put itself in the place of the commission, and try the facts in controversy de novo. The district court can review the findings of the commission only so far as to determine whether or not the rates fixed are so unreasonable as to be confiscatory, just as an appellate court reviews the verdict of a jury for the purpose of determining whether it is so excessive that it cannot stand. Under the statute, the district court should in this case have determined to what extent the rates fixed by the commission should be modified, so that such rates would not be confiscatory, just as an appellate court often determines how much an excessive verdict shall be cut down, so that it may stand for the balance, and a new trial be denied. The court below held that it had no jurisdiction to determine to what extent the rates here in question should be thus modified, and in this it erred. Of course, in determining whether the rates fixed are confiscatory, the court must incidentally consider what are reasonable rates, but it must also resolve every reasonable doubt on that question in favor of the findings of the commission.

5. There is another question in regard to the principles on which the district court should proceed to review the acts of the commission. Ordinarily, on appeal from one tribunal to another the evidence on which the lower tribunal acted is returned, and the decision is reviewed in the light of that evidence. But the commission need not base its decision wholly on any such evidence. It is not a judicial tribunal, but an administrative body, whose powers are somewhat legislative in their character; and, like other administrative or legislative bodies, it acquires a knowledge of the facts, circumstances, and conditions in its own way, and need not act on the theory that the parties should have a formal hearing on notice, except so far as the statute expressly so requires. The members of such a commission should be men of great financial ability, who

have had a large amount of training and experience to fit them for their responsible and difficult duties, and they should be thoroughly familiar with the many financial and economic problems which enter into the business of constructing and operating railroads.

How is a judge, who is not supposed to have any of this special learning or experience, and could not take judicial notice of it if he had it, to review the decision of commissioners, who should have it and should act upon it? It seems to us that such a judge is not fit to act in such a matter. It is not a case of the blind leading the blind, but of one who has always been deaf and blind insisting that he can see and hear better than one who has always had his eyesight and hearing, and has always used them to the utmost advantage in ascertaining the truth in regard to the matter in question. Before a judge can act intelligently in such a matter, he must have an amount of this special knowledge and experience which it will take him years to acquire. It is not sufficient that he take his first lessons from the partisan, and perhaps perjured, experts, or so-called experts, produced by the parties at the trial. He must have a broader, clearer, and surer grasp of the subject than he can get from any such unreliable lessons.

We see no way of disposing of this question except to hold that on appeal from the commission the court should, to the best of their ability, take judicial notice of all such technical learning, knowledge, and information of a general character as should be known and understood by the commission. Whether the court should go further, and take judicial notice of the particular facts in the case, is a different question, and one which need not be now considered. The district court, on appeal to it, should at least take judicial notice of all these general matters, and on appeal from the district court this court must also take judicial notice of these matters. Thus, when the court below takes judicial notice of a particular ordinance, the appellate court must, on appeal to it, also take judicial notice of such ordinance, although in some other cases such appellate court would not do so. Foley v. State, 42 Neb. 233, 60 N. W. 574; Smith v. City, 27 Kan. 528; Town v. Velton, 35 W. Va. 217, 13 S. E. 373. See, also, Lloyd v. Matthews, 155 U. S. 222, 15 Sup. Ct. 70. Then, although the constitutional jurisdiction of the courts to re-

view the acts of the commission is thus limited, the statute, in providing for such appeals from such acts, has thrown upon the courts some new and extraordinary duties.

Let us now proceed to apply these general principles to this case. The four great questions involved are:

(1) What would it cost to reproduce the railroad?

(2) What is a reasonable income on such cost?

(3) What amount of income will the maximum rates fixed by the commission produce?

(4) Is such amount so much below what is a reasonable amount that the court can say, as a question of law, that the rates so fixed are confiscatory?

We shall now, so far as necessary, take up each of these questions in its order.

. 6. (1) The court below found that the cost of reproducing the 1,381 miles of main track and the 249 miles of side track now owned by the lessor and operated by the lessee in this state is as follows: .

| | |
|---|---:|
| Grading, etc. | $ 7,000,000 |
| Ballasting | 1,440,000 |
| Steel rails, etc. | 4,000,000 |
| Ties | 2,025,000 |
| Equipment (engines, cars, etc.) | 5,178,750 |
| Superintendence of construction | 2,750,000 |
| Total | $22,393,750 |

After finding all of these items specially, the court further finds:

"Another item is interest upon money which has been procured, and which lies idle during construction and before earnings can be had. As to this item the estimate made was not controverted.

"Taking into account the items to which I have referred, and the other items entering into construction, concerning which there is little, if any, dispute, also taking into account the cost of acquiring terminal grounds and terminal facilities in the cities of St. Paul and Minneapolis, I find that it would reasonably cost to reproduce the lines of the Manitoba Company in this state, with its equipment and terminal grounds, and facilities necessary for the traffic of this state, the sum of $44,000,000, or something less than $32,000 per mile of main track. The increased cost of production is largely attributable to the increased value of terminals, right of way, depot grounds, etc."

The court was requested by the attorney general to make more definite findings as to the cost of right of way and terminals, and refused to do so. In this the court erred, for the reason that, as will be hereinafter shown, the railway company is entitled to a much less percentage of income on the value of its terminals than it is on the cost of reproducing the rest of the road. The uncontradicted evidence is that the interest charged during the time of construction, and the discount and commission, amount to ten per cent. of the total cost of construction. But we are at a loss to know what other items, outside of the cost of right of way and terminals, the court intended to find as entering into the cost of reproducing the roads. As we shall now proceed to show, the cost of reproducing the right of way and terminals will not, according to the highest estimates, exceed $16,961,585, and this would leave about $2,000,000 of the $44,000,000 of the total cost yet to be accounted for.

D. C. Shepard was called as a witness, and made the following estimate as to the cost of the right of way, exclusive of terminals:

Right of way, 19,280 acres, at $65 per acre.......................... $1,253,200
Depot grounds, 1,800 acres, at $700 per acre.......................... 1,260,000
Gravel pits, 657 acres, at $100 per acre............................ 65,700
Yards at division points, 479 acres, at $700 per acre................ 335,300

$2,914,200

Col. Crooks, the engineer of the railway company, in his testimony gave the following estimates:

Right of way, other than between St. Paul and Minneapolis, 19,280
 acres, at $50 per acre............................................ $  964,000
Depot grounds, 1,800 acres, at $500 per acre....................... 900,000
Gravel pits, 657 acres, at $100 per acre........................... 65,700
Yards at division points, 480 acres, at $750 per acre.............. 360,000

$2,289,700

Kalman and two other witnesses gave as the value of the terminals in St. Paul $6,977,135, and Dawson gave as their value $2,562,747. C. McC. Reeve estimates the value of the terminals in Minneapolis at $5,520,250; T. B. Walker estimates their value at $4,862,610; and J. B. Bassett at $4,218,062. In addition to these, Grover estimates the value of the interest of the lessor, the Manitoba Company, in the

Minneapolis Union Railway Company, which owns the Union Depot grounds and tracks, at $900,000; in the Minnesota Transfer Railway Company, which owns the general transfer yards between Minneapolis and St. Paul, at $250,000; in the St. Paul Union Depot and its properties, at $400,000. Adding together the highest estimates on right of way and terminals, it results as follows:

| | |
|---|---:|
| Right of way, etc. (Shepard) | $ 2,914,200 |
| St. Paul terminals (Kalman) | 6,977,135 |
| Minneapolis terminals (Reeve) | 5,520,250 |
| Interest in Minneapolis Union Railway Company | 900,000 |
| Interest in Minnesota Transfer Railway Company | 250,000 |
| Interest in St. Paul Union Depot | 400,000 |
| Total | $16,961,585 |
| Deducting right of way, etc. (first item) | 2,914,200 |
| Cost of reproducing terminals | $14,047,385 |

This gives in round numbers $14,000,000 as the cost of reproducing the terminals, and $30,000,000 as the cost of reproducing the rest of the road.

Whether or not these findings as to the cost in 1894 of reproducing the road are in all respects sustained by reasonable and credible evidence, it is not necessary to consider. For instance, it may well be doubted whether the court was warranted in allowing an interest charge of ten per cent. on the whole cost of construction, although the evidence in favor of this charge (including discounts and commissions) was wholly uncontradicted. As we shall endeavor hereafter to show, ten per cent. is, in these times, reasonable interest for more than two years on such a vast sum of money; and, with the improved facilities which now exist for constructing railroads, it may well be doubted whether the capital invested in reproducing these roads through the fertile and comparatively well-settled districts through which they run would, on an average, be all sunk for more than two years before it would commence to bear dividends. It may also be a question whether the court did not place an extravagant value on some items of construction, and an extravagant value on the terminals. In finding the cost of reproducing the roads within this state to be $44,000,000, the court must have found the cost of reproducing the terminals to be not less than $14,000,000.

Again, the court has allowed $25 per ton for steel rails delivered in this state. As rails have since fallen greatly in price, until they are now worth but about $16 per ton in the Eastern markets, this could hardly be taken as a precedent for future cases.

7. (2) Let us now consider what in these times is a reasonable income on $14,000,000 invested in these terminals, and $30,000,000 invested in the rest of the road. The great value of the real estate covered by these terminals is given to it by anticipating the future. Very little of this real estate is in or near to the business center of either city. Most of it is outlying city property and suburban property. It is safe to say that other real estate similarly situated, in the same portions of St. Paul and Minneapolis, does not, on an average, yield an income of one per cent. per annum above the taxes on the price or valuation at which it is held; and there is, as a general rule, no use to which such property can be put that will cause it to yield any greater income. In fact, it is doubtful if the same area of other property along and around these terminals could, on an average, by any use to which it could be put, be made to yield an annual income of one per cent. on one-third of the valuation placed on these terminals.

Again, it is safe to say that in ordinary times, at least, capital could readily be found to buy such property at its market value for the purpose of renting it for one per cent. per annum above the taxes on it. In fact, millions have often been invested in such property without any prospect of any income at all from it for many years, and undoubtedly such will be the case again. Such real estate is valued, not on account of its present power to produce an annual income but because it is believed that it will be still more valuable in the future. The owner of such property cannot expect to eat his loaf and still have it. He cannot expect that the property will pay a full-sized annual dividend, and at the same time double or treble in value every 10 or 20 years. He expects his dividends to accumulate in the form of increase in value. Thus, according to the railroad company's own showing in the present case, much the greater portion of the terminals which it now values at $14,000,000, were originally procured for the sum of $381,117. If

this is true, the company has already realized some tremendously large dividends on these terminals.

Again, if it and the owners of other property similarly situated have anticipated the future too much, and have set too high a value on their property, so that, in the opinion of the public, there is no prospect of any material increase in its value in the near future, that does not prove that the property should produce greater annual dividends. It simply proves that this property cannot be sold on the market for what they pretend to value it at, and that before sales can be made the price asked must be reduced, so that there will be a prospect of future increase in value sufficient to warrant investment, because the public, who fix the market price, do not and cannot expect that the annual income derived from such property will ordinarily be sufficient to pay interest on the investment. The market price of such property is not controlled, or, at most, is controlled only in part, by its power to produce immediate annual income.

Again, the public, and not the court, must be the judge of whether or not such property will increase in value in the future, and, if so, how much. Whether the conditions warrant the opinion of the public in the matter is a question which the courts cannot go into, in such a case as this, any more than in many other cases where public opinion establishes market prices. And, where such property cannot be made to produce a reasonable annual income on the present market price of the same, it is clear that the public have anticipated a future increase in such market price. It is no answer to this argument to say that the railroad company may not want to speculate, and is entitled to more definite, and perhaps more substantial, returns on its investment. It necessarily becomes a speculator when it invests in such property. It has so invested, and profited enormously by its speculations. The investments of a railroad company in this class of property are no more sacred in the eyes of the law than the investments of private parties in the same class of property. For the purpose of determining what is a reasonable income to a railway company from its investments in this class of property used for railroad purposes, we have a right to consider what is a reasonable income to private persons from their

investments in the same class of property when used for private purposes.

There is another consideration which, it seems to us, adds most conclusive proof that our position here is correct. The traffic on these railroad terminals will not bear any such excessive and unreasonable charges as it would be necessary to make in order to produce full-sized dividends on the enormous valuation placed on the terminals. In this case the cost of reproducing the terminals is, as we have seen, one-third of the cost of reproducing the whole railroad system within the state. If rates were fixed by the law or by the railway company for the terminals, and separate rates for the rest of the road, so that the public would have a right to use the rest of the road without using the terminals, and these rates were fixed on the basis of requiring the terminals to produce one-third of the net earnings within this state, grass would soon be growing on the terminals. The public would soon find ways by which to avoid incurring the enormous expense of using the terminals. Rather than pay three, four or five dollars for riding on the terminals, the passenger coming to St. Paul or Minneapolis would leave the train beyond the terminals, and ride to his destination on a street car for five or ten cents. Rather than incur an expense of eight, ten or twelve dollars for hauling a car of freight over the terminals, the shipper could afford to unload the car beyond the terminals, and haul the freight to its destination on wagons and drays. But he would not have to do this very long. Some one would soon construct a belt line or a system of switches to connect him with other railroad tracks and other terminals, over which his car would be hauled to its destination for the ordinary switching charges of from two to five dollars per car. If these excessive charges for the use of terminals could not be thus avoided, they would constitute a prohibitory tariff, which would prevent a large amount of public traffic from entering or passing through these cities. Nearly all the through freights would go around these cities, and all the grain elevators would have to be erected beyond the limits of these costly terminals, at points where connections could be made for reshipping without having to use the terminals at all.

A number of the companies owning the railroads radiating west, northwest, and southwest from Chicago claim that the cost of reproducing their Chicago terminals would be as great as the cost of reproducing all the rest of their systems of roads. If they were required by law to make a separate charge to each patron for the use of these terminals, and another separate charge for the use of the rest of the road, so that he might avoid using the terminals if he could, and they attempted on this basis to make the terminals produce one-half the net earnings of the whole system, how absurd would be the result. It is well known that, for the use of such terminals, ordinary switching charges are from two to five dollars per car. But why should rates over these terminals be so low for the short haul and so high for the long haul? In the economy of railroading, the charge for the long haul should not be greater in proportion than the charge for the short haul; not greater, certainly, than the sum of all the charges for the short hauls, which, connected together, would make the long haul. But the position taken here by the railway company violates this rule most grossly.

Then, from all of these considerations, it is clear that where real estate outside of the business center, and in the outlying districts, of a city, has been given a large speculative or prospective value, it cannot, whether used for railroad terminals or other purposes, be made, ordinarily, to produce a reasonable annual income on the investment, and the profits which are expected from such investments are not annual, but accumulated, profits, to be realized by future increase in value. Neither do these considerations deter railroad companies from investing liberally in such property. They, as well as other investors, have always been desirous of taking advantage of any such expected increase in value, and it has been quite common for companies having the means to acquire terminals in a growing city far beyond their present needs. It is not necessary to determine here what rate of annual income on the cost of reproducing these terminals is the lowest which the court would uphold before declaring the rates fixed by the commission confiscatory. But we are of the opinion that, exclusive of taxes, $2\frac{1}{2}$ per cent. per annum in 1894 is a liberal income on such cost, and that is as far as it is necessary to go for the purposes of this case.

8. Let us now consider what is a reasonable income on the other $30,000,000, the cost of reproducing the rest of the road. The rate of interest on money and the ordinary rates of income on capital invested have fallen enormously in the last few years. Every one knows this, and the court that does not know it is certainly not fit to review the acts of a commission that should know it.

Prof. Farnham, of Yale University, in the Yale Review for August, 1895 (volume 4, pp. 199–201), gives statistics to prove that since 1873 rates of interest had up to that time fallen 52 per cent. They have fallen greatly since. The London Economist of July 3, 1897 (page 948), states that in Great Britain, within the last six months, large loans have been placed by the cities of Glasgow, Leeds, and Brighton at less than 2½ per cent. interest per annum, and that the bonds of those cities, drawing that rate of interest, sold above par. Every court ought to know that there is now, and has been for some time, a glut of capital in the world's markets. For a long time the great wars of the world absorbed the principal portions of the world's surplus capital. This ended in 1871 with the Franco-Prussian war. For more than 20 years after that, enormous amounts of the world's surplus capital were absorbed in constructing railroads and other internal improvements. But this capital, unlike that consumed in the wars, earned enormous amounts of income, which were again added to the world's surplus capital seeking new investments. Modern improvements, resulting in increased production, and other causes, have, in progressive countries, been accumulating vast amounts of capital. The amount of such capital seeking investment has increased, while the demand for the same has fallen. And, where there are two dollars of idle capital to the one dollar of safe investment, the effect is the same as where there are two workingmen to the one job. The amount of hire is reduced. The competition of capital with capital is continually cutting down the profits on investments and the rates of interest on money.

This is no new theory. John Stuart Mill, in his Principles of Political Economy, devotes a chapter to "The Tendency of Profits to a Minimum." Bk. 4, c. 4. See, also, Adam Smith's Wealth of Nations, bk. 1, c. 9; Id. bk. 2, c. 4; Wells, Recent Economic Changes,

pars. 418–422. Idle capital may increase enormously while there is no increase in the volume of the currency at all, and even while the volume of currency is decreasing. The amount of capital on hand seeking investment is something quite distinct from the volume of gold and silver money and other currency. Smith, Wealth Nat. bk. 2, c. 4; Mill, Pol. Econ. bk. 3, c. 23, § 4. On these points all the leading authorities of the world agree.

The court below made as a finding of fact the following:

"Of the bonds of the said Manitoba Company, the interest on which is assumed by the Great Northern Company as aforesaid, there are outstanding on account of its lines in the state of Minnesota $26,312,000, of which $2,322,000 bear interest at 7 per cent., $16,536,000 at 6 per cent., and $7,454,000 at 4½ per cent. Such rates of interest are not unreasonable, and are lower than the bonds of Western railroads usually bear."

The court seemed to consider a difference of 2½ per cent. in the rate of interest as a trifling matter, but it amounts to a difference of $1,100,000 a year on the $44,000,000 which the court found it would cost to reproduce this road. Even the difference between 4½ per cent. and 6 per cent. per annum on $44,000,000 would amount to $660,000 a year. If 4½ per cent. is reasonable interest on these bonds, 6 and 7 per cent. are both grossly excessive. A glance at the bond quotations in the back numbers of Bradstreet's Journal or the Bankers' Magazine will show that some of these 6 per cent. bonds— those maturing in 1909 (2d—6's, 1909)—were sold in the markets at an average of more than 118 during the first half of 1893 and the last half of 1894, and were on July 17, 1897, quoted at 122¼. Those of said 6 per cent. bonds maturing in 1933 (1st con. 6's, 1933) were during the first half of 1893 and the last half of 1894 sold at an average of more than 121, and on July 17, 1897, were quoted at 126. The 4½ per cent. bonds above mentioned are the same series of bonds as the last, with the interest reduced before issue to 4½ per cent. (1st con. 6's, 1933, reduced to 4½'s), and during the first half of 1893 and the last half of 1894 they sold on the markets for from one to three per cent. above par, and on June 17, 1897, were quoted at 106½. Vice President Clough, of the Great Northern Company, testified that at the time these bonds were issued the interest was reduced to

4½ per cent. because it was found that they could be floated at par at that rate. During the acute stages of the panic in the last half of 1893 and the first half of 1894, these bonds declined from three to five per cent., and fluctuated considerably in price.

But the temporary effect of conditions which existed at that time can have but little weight in the consideration of the questions here involved. A railroad company is not entitled to a greater income during the acute stages of a panic because rates of interest are temporarily higher during such times. Permanent investments do not, as a general rule, bring higher rates of income during such times. It would rather seem from these quotations that 4½ per cent. per annum was in 1894 a very reasonable rate of interest on such railroad bonds, and that six and seven per cent. per annum was grossly excessive and unreasonable. If the railway company has made what turns out to be a bad bargain by issuing its bonds for six and seven per cent. interest per annum, that should be its misfortune, and not the misfortune of the public. As before stated, neither the state nor the public has either directly or indirectly guarantied that rates of interest and rates of income would not fall, to the detriment of the railway company.

It is true that the market quotations to which we have referred show that bonds of many other railroads bearing six and seven per cent. interest per annum have during all these times sold away below par. The management of the Great Northern system has since the foreclosure of 1879 been so economical, and so much in the interest of its stockholders and bondholders, and so free from the jobbery and corruption that has characterized the management of some other roads, that its bonds sell at a premium. And we do not wish to be understood as taking the position that because of this faithful management this railway company should be rewarded by the cutting down of rates. The question before us is not whether the management was good or ill, but what in 1894 was a reasonable rate of interest on such large sums of money as are loaned to railroad companies where the loans are well secured; and this question is merely incidental to the main question of what in 1894 was a reasonable income on the cost of reproducing the railroads. An examination of the bond quotations above referred to will show that,

where railroad bonds are amply secured, 4 or 4½ per cent. per annum has been for the last few years rather a high rate of interest.

But by reason of the decline in the cost of construction, and the decline in what is a reasonable rate of income, the bonds of but few railroads are now well secured. Twenty years ago the cost of railroad construction was at least twice as much as at the present time, and a reasonable rate of income on such cost was twice as much as at the present time. Therefore a reasonable amount of net income on the same mile of road (beyond the terminals) was about four times as much then as it is now. For these reasons a large amount of railroad bonds floated years ago, for the full cost of the roads, at high rates of interest, are now very poorly secured. And on the maturity of such bonds, or when an attempt is made to re-organize the road on foreclosure, it is found difficult to scale down the amount of indebtedness to a point where the road will, under present conditions, be sufficient security for bonds drawing a fair rate of interest. These things tend to make the present rates of interest on railroad securities unreasonably high. The farmer does not expect to be able to float at a reasonable rate of interest a mortgage on his farm for more than one-half or two-thirds of its present cash value. The owner of a business block on a city lot cannot float a mortgage thereon at a fair rate of interest for more than one-half or two-thirds of what it would cost to reproduce the property at this time. It may have cost him twice as much to produce it twenty years ago as it would now, but that is immaterial. If the bonded indebtedness of such railroads (not including terminals) was reduced to one-half or two-thirds of the present cost of reproducing the road, the most of the roads in the Mississippi valley would not be bonded for more than $10,000 or $12,000 per mile; and it ought to be possible now to float that amount of indebtedness at an annual interest of about 3 or 3½ per cent., —certainly at not more than 4 per cent.,—if the road traverses fertile territory, reasonably well populated, and not overbuilt with railroads.

Where the loss in value caused by the decline in the cost of construction is compensated by the increased value of terminals, and the bonds are liens on such terminals, the security, of course, is better. But, as I have already shown, such terminals cannot be

expected to pay annual dividends in proportion to their value, and cannot be made to do so.  Thus, while such increase in the value of the terminals may compensate for the loss of value in the rest of the road, it cannot compensate for the loss of power to pay annual dividends caused by such decline in the cost of construction, and the decline in rates of income from investments generally.

But should the losses caused by all of these economic changes be borne by the public, or by the owners of the railroad?  There can be but one answer to this question.  As we have repeatedly stated, neither the state nor the public have ever guarantied that railroads would always be worth the amount originally invested in them, or that what is a reasonable rate of income would not be less in the future than it was at the time of the investment, and have never guarantied, directly or indirectly, either the interest or principal of railroad bonds.  These losses must be borne, not by the public, but by the owners of the railroad; and, as against the public, the holders of the bonds have no greater rights than the railroad company itself.

It is not necessary here to determine just what rate of annual income on the cost of reproducing all of the road except the terminals is the least which the court would uphold before declaring the rates fixed by the commission confiscatory, but we are of the opinion that in such times as existed in 1894 an income of five per cent. per annum on such cost is certainly not unreasonably low or confiscatory, and that is as far as it is necessary to go in this case.  More especially is this true since it appears from the evidence that in years prior to 1894 this system of roads had produced some very large amounts of income, sufficient to make extraordinary improvements and betterments in the road, as well as ordinary repairs, to pay large dividends, and accumulate a cash surplus which in 1894 amounted to about $3,500,000.  Besides, the Minnesota Eastern Railway Company, which is owned and controlled by the Great Northern Railway Company, had at that time a cash surplus of $1,000,000.

The managers of railroads have no right to play with the public the game of "heads we win, tails you lose."  "When times are prosperous and dividends large, we win.  When times are hard and busi-

ness dull, the public must lose." If bondholders put themselves in a position where this game can be played on them, that is their fault. But there is no ground for saying that the bondholders of this system of roads are in any such position. The profits of the railroad business fluctuate very considerably. When times are prosperous, and capital invested in other lines of enterprise is, as a general rule, bringing good returns, that invested in the railroad business brings good returns also. In times of financial stringency, when other classes of commercial concerns are doing business at a loss, there is no reason why a railroad company must still make good profits. This system of roads earned large dividends when times were prosperous. If times become again prosperous, its prospects for making good profits on the cost of reproducing the system are at least as good as the prospects of business concerns generally. While the courts should not take judicial notice of what is said in the books and publications above cited, the courts should in this case take judicial notice of the facts as to which the citations are made, regardless of where such facts are published. It is the fact itself of which the court takes judicial notice, not the publication in which it is laid down.

In determining whether the rates fixed by the commission are confiscatory, we have not found it necessary to determine the effect of the very important fact that this railroad received from the state a very large and valuable land grant.

9. (3) Let us now consider the third question,—what amount of income will the maximum rates fixed by the commission produce? As to the rates for shipping grain, the court below found:

"At the time the complaint herein was made, the said two railroad companies had so established the rates, and each charged from East Grand Forks and Fisher to Minneapolis or to Duluth the sum of 17 cents per hundred pounds, and from Crookston to Minneapolis or Duluth $16\frac{1}{2}$ cents per hundred pounds. Under the rates as fixed by the commission, the Great Northern Company would charge as follows: For 100 lbs. from East Grand Forks to Duluth, 16.5 cents; for 100 lbs. from Fisher to Duluth, 16.2 cents; for 100 lbs. from Crookston to Duluth, 16 cents; for 100 lbs. from East Grand Forks to Minneapolis, 15 cents; for 100 lbs. from Fisher

to Minneapolis, 14.8 cents; for 100 lbs. from Crookston to Minneapolis, 14.5 cents."

The rates of the Great Northern Railway Company for carrying grain within this state for all other distances and from all other points were correspondingly reduced, and the court below found that, if such change in the rates had been in force in 1894, the reduction in the revenue of the Great Northern Railway Company by reason thereof would have been $248,992. The court further found that the rates as thus reduced are unreasonable and confiscatory.

As lessee of the Manitoba Railway Company, the Great Northern Company operates 3,816 miles of main track, of which only 1,381 are within this state. For the purpose of this case the railroad company, classifies its business into local and through business,—local business when the haul both begins and ends in this state, and when it begins or ends in this state; through business when the haul begins beyond the state on one side, extends across the state, and ends beyond it on the other side.

For the purpose of payment of taxes on their gross earnings in this state, the railway companies have always divided the gross earnings from their interstate business on a mileage basis; and counsel for the state contend that for the purposes of this case, also, the gross earnings on such through business should be apportioned on a mileage basis (that is, that the part of the net earnings on such through business which should be regarded as earned in this state corresponds to the part which the number of miles of haul in this state is of the number of miles in the whole haul). The court finds that, on this basis—

The gross earnings in this state from such through business was in 1894............................................................ $3,385,239
Gross earnings in state from other business...................... 2,949,415

Total earnings in state....................................... $6,334,654

On the other hand, while the railway company admits that the gross earnings on all interstate business except such through business should be divided on the mileage basis, it contends that the gross earnings on such through business should, for the purpose of

fixing rates, be divided as follows: First, there should be credited to Minnesota the operating expenses within this state on such through traffic, and this should be deducted from the total gross earnings on such traffic; second, there must be deducted from the remainder the operating expenses beyond the state on such traffic, and the amount of all fixed charges beyond the state; and, third, the remainder should be credited to Minnesota. We do not understand counsel to claim that the net earnings on local business beyond the state should not first be applied to the payment of fixed charges beyond the state, though the wording of his rule would so imply. The court finds that on this basis the gross earnings in this state in 1894 on such through business were $1,700,683, making the total gross earnings in this state in that year $4,650,098, or $1,684,-556 less than when the gross earnings on such through business are divided on a mileage basis, as contended for by the state. The court found the operating expenses in 1894 of the Minnesota part of the lines to be $2,773,856, and the fixed charges which the Great Northern Company was bound to pay on account of such part of its lines to be in 1894 as follows:

| | |
|---|---:|
| Interest on Minnesota portion of bonded debt (the items of which are given in a part of the findings above quoted, and will be again given hereafter) ................................................. | $1,490,130 |
| Taxes ............................ ............................. | 184,756 |
| Rentals .................... ........................ ............. | 133,496 |
| Six per cent. dividend on $15,000,000 of Manitoba stock........... | 900,000 |
| Total.................................................. | $2,708,382 |

| | |
|---|---:|
| Dividing the gross earnings on the through business on the mileage basis, the gross earnings in 1894 on the part of the lines in this state are................................................. | $6,334,654 |
| Operating expenses....................................... | 2,773,856 |
| Net earnings ........................................... | $3,560,798 |
| Fixed charges ............................................ | 2,708,382 |
| Balance of net profits...................................... | $   852,416 |
| Reduction which would be caused by rates as fixed by commission | 248,992 |
| Balance of net profits with rates reduced...................... | $   603,424 |

On these figures the court held that, if it is proper to divide the

gross earnings on through business on the mileage basis, the rates fixed by the commission are not unreasonable or confiscatory, but that, if such gross earnings should be divided in the manner contended for by the railway company, it would leave a net deficit of ($1,684,556—$603,424) $1,081,132, and that such rates would be confiscatory. The court did not attempt to settle the controversy as to how the gross or net earnings on such through business should be divided, but held the rates fixed by the commission confiscatory, for reasons which will be hereinafter stated.

It may well be that for the purpose of taxation, under the constitution and laws of this state, such gross earnings should be divided on one basis, and that, for the purpose of determining whether the rates fixed are confiscatory, the net earnings on such through business should be divided on some other basis. The total gross earnings in 1894 from all of the leased lines were $11,385,770. If this is divided on a mileage basis, it gives $6,334,654 as earned on the 1,381 miles of main track in Minnesota ($4,587 per mile), and $5,051,116 as earned on the 2,435 miles of main track west of Minnesota ($2,074 per mile). It will be observed, therefore, that the traffic on these lines is considerably more than twice as heavy in Minnesota as it is beyond the state. Under these circumstances, a division of the gross earnings on the mileage basis is neither just nor reasonable. Operating expenses are proportionately higher on the portion of the road having the least business. Besides, higher rates must be charged on the business of that portion of the road, in order to make a reasonable income on the cost of reproducing it. Therefore, if the business is divided on the mileage basis, it may give Minnesota the benefit of high rates charged elsewhere, which the railway company is not entitled to charge in this state.

Let us now examine the rule of apportioning the earnings contended for by the railway company. Its position is that if this system of roads had been built from St. Paul and Minneapolis to the west line of this state, and no further, the patrons of the road in this state would have had no benefit from any traffic west of the state, and that under the rule proposed these patrons have lost nothing by the extension of the lines beyond the state, as they are not required to pay any of the fixed charges beyond the state, for

this rule requires such through traffic to pay at least its own oper- ating expenses in this state. This position is untenable. It is perfectly natural that a railroad extending to the great wheat fields of the Red River valley should draw traffic from one side of that valley as well as the other, regardless of the fact that this valley is divided by the state line; and a road from St. Paul and Minneapolis or Duluth that extended only to such state line, and had always terminated at that point, with no railway connections or feeders beyond, would not be an enterprise planned or conducted on busi- ness principles. The people of Minnesota are entitled to all the benefits which should come to them from the fact that just beyond the border of this state there is a large area of fertile territory, which furnishes a very considerable amount of railroad traffic that co-operates with a large amount of similar traffic in this state to make reasonable rates on each side of the line much lower than they would be if the railroad could only get business on the one side of the line or the other.

10. Again, it is asserted that this rule would not compel the patrons of the road in this state to pay any part of the fixed charges of the road outside of the state. Let us see if this assertion is necessarily true. Let us suppose that this system of roads had been built across Minnesota and the east half of North and South Dakota, but no further, and that the fixed charges on all parts of the system were equal to a reasonable income on the cost of repro- ducing the same. All parts of this system being in fertile territory, comparatively well settled, and capable of furnishing a large amount of railroad traffic, the system would earn a fair income at very low rates; and, on the additional business obtained by the extension of the lines from Minnesota into the eastern half of the Dakotas, sufficient would be earned, at reasonable rates, not only to pay all the operating expenses on such additional business for the whole length of the haul on the same, and the fixed charges in the Dakotas, but also to pay such just and equitable portions of the fixed charges in Minnesota as all the business to and from the Da- kotas should pay because of a part of the haul on the same being over the lines in Minnesota. And it does not necessarily follow

that such just and equitable portion must be found by dividing the gross earnings on such business on such mileage basis.

We shall now suppose that, after this state of things had existed for many years, the management extended the lines out through the less fertile and almost uninhabited regions further west, to the west line of the Dakotas, and that the fixed charges on such extensions were equal to a reasonable income on the cost of reproducing the same. Let us further suppose that the additional traffic obtained by such extensions did not more than pay the operating expenses on the whole length of the haul on such traffic and one-fourth of the fixed charges on such extensions. The other three-fourths of such fixed charges would have to be paid out of the earnings on other Dakota business, and, although rates in the Dakotas were raised to make up the deficiency on such fixed charges, there would be left no part of the earnings on the Dakota through business, which passes entirely across Minnesota, to apply on the fixed charges in Minnesota; and rates in Minnesota would have to be raised, for two reasons: First, to meet the deficiency in net earnings to pay the fixed charges in this state; and, second, because rates would now be comparatively lower in this state than in the Dakotas. Then it is clear that the traffic in Minnesota would, either directly or indirectly, have to bear a portion of the fixed charges on the new extensions in Western Dakota.

But why should the people of Minnesota and Eastern Dakota be made to pay an income on this idle railroad property further west? If these extensions of the lines turn out to be an unprofitable venture, clearly the loss should be borne by the railway company, and not by the people of Minnesota and Eastern Dakota. To say that the country owes a railroad company a living is one thing. To say that the country must indemnify a railroad company against all of its own mistakes is a very different thing. To hold that a railroad company can impose on the public all kinds of burdens, by all kinds of unbusinesslike ventures and speculations, would be monstrous.

These considerations lead to the conclusion that when any feeder or extension, portion of a railroad line or system, is an incumbrance on the rest of the line or system, so that the rest of such line or

system would, at the same rate, produce more net income if such portion did not exist, then such portion is not self-supporting; that is, if all the gross earnings on all the traffic passing over such portion, and on the whole length of the haul on such traffic, will not pay the operating expenses on such traffic for the whole length of such haul, and pay for the wear and tear on the line caused by such additional traffic, and also pay a reasonable income on the cost of reproducing such portion of the line, and these conditions are not of a temporary character, but are the result of building the feeder or extension where there was not sufficient business to justify its existence, then such portion is not self-supporting. A portion of a line that is not self-supporting is not a feeder, but an incumbrance; and in determining what are reasonable rates on the rest of the line or system, any state has a right to reject such portion from the line or system. Of course, in rejecting the same all benefit to the rest of the line or system from traffic passing over such portion must also be rejected, and nothing can be allowed to the rest of the line or system on such traffic, except the operating expenses on the same, including the additional wear and tear on the rest of the road caused by such traffic.

Whether this rule would apply where such a portion of a line or system ceased to be self-supporting by reason of some temporary cause, such as an unusual drought or a pestilence, we need not consider.

It seems to us that there is scarcely any good reason why a railway system should be divided on state lines at all for the purpose of fixing rates. After rejecting the portions that are not self-supporting, the balance of the system may be considered as a whole; and, in fixing rates in one state, it will only be necessary to see that, if rates are properly adjusted throughout so as to correspond with the rates thus fixed, the whole of such balance of the system will yield a reasonable income on the cost of reproducing the same. In determining what is a proper adjustment of rates as between the different portions of the system, every case must depend on its own circumstances.

We do not wish to be understood as assuming that in fact any portion of the railway system here in question is not self-supporting.

There is no evidence on that point either one way or the other.   But under the statute the burden was on the railway company to make out its case, and when it showed such a great disparity between the earnings in this state and the earnings outside of the state, and when it claimed that the people of Minnesota were entitled to so little benefit ($158 per mile) from the large amount of through business carried across the state, it should have gone further, and shown that all, or substantially all, of its system was self-supporting; that no substantial portion of the system was an incumbrance on the rest of it.

11. Let us now proceed to consider further some of the other questions in the case.   As we have seen, it is not the amount of bonds and stocks and the amount of interest or dividends which some one has guarantied or agreed to pay that determines whether or not the rates fixed by the commission are confiscatory, but this is determined by what, under the circumstances, is a fair income on the cost of reproducing the road.   The court below adopted the former test instead of the latter.   In finding the amount of "interest on Minnesota portion of bonded debt," it adopted the table furnished by the railway company, and called "Second Supplement to Exhibit J," which is as follows:

Details of interest, $1,490,130, on Minnesota proportion of bonded debt of St. P., M. & M. properties:

| | | |
|---|---|---|
| $  2,322,000..................at 7 per cent..................... | $  162,540 |
| 7,454,000..................at 4½ per cent..................... | 335,430 |
| 16,536,000..................at 6 per cent..................... | 992,160 |

$26,312,000                                                              $1,490,130

To this the court added a further charge of 6 per cent. on $15,-000,000 of the Manitoba stock, on which the Great Northern Company agreed to pay a dividend of 6 per cent. per annum.   In these times, as we have seen, 5 per cent. per annum on the cost of reproducing all of the road except the terminals, and 2½ per cent. on the cost of reproducing the terminals, is a liberal income, and the fact that the railroad company agreed to pay interest and dividends at the rate of 6 and 7 per cent. per annum does not concern the patrons of the road.   The court found the cost of reproducing the part of the road within this state to be $44,000,000.   Of this, as we have

seen, about $14,000,000 is the cost of reproducing the terminals, on which 2½ per cent. per annum is a liberal rate of income, and 5 per cent. is a liberal rate on the balance.

| | |
|---|---:|
| 5 per cent. of $30,000,000 equals | $1,500,000 |
| 2½ per cent. on $14,000,000 equals | 350,000 |
| Total amount of reasonable income | $1,850,000 |
| Taxes | 184,756 |
| Rentals (to companies other than the Manitoba) | 133,496 |
| Total | $2,168,252 |

Then if the net earnings in 1894 in this state would, under the rates fixed by the commission, amount to the last-named sum, such rates were not confiscatory. This sum is very much less than the $3,560,798 of net earnings in this state, which we get by dividing on the mileage basis the gross earnings on the through business; and, after deducting from the last-named sum the $248,992 which the net earnings would be reduced by the rates fixed by the commission, we have $3,311,806. Deducting said $2,168,252 from this leaves $1,143,-554 to compensate for whatever error may exist in the rule of apportioning the earnings on through business on the mileage basis. In other words, by so apportioning the earnings on the mileage basis, we would have the last-named sum earned, or assumed to be earned, in this state, to apply to fixed charges and expenses beyond the state, and still the rates fixed by the commission would not be confiscatory.

But the railway company made no case which required the court to make any division of the earnings between the parts of its lines within and the parts of its lines without this state. Under our statute [6] the burden is on the railway company to prove that the rates fixed by the commission are confiscatory. The witnesses for the railway company did not give the data on which they estimated what part of the gross earnings on such through business should be credited to Minnesota. And, in estimating the amount of fixed charges, it is evident that these witnesses and the court below assumed that the proceeds of all of the $84,558,484 of bonds outstand-

[6] G. S. 1894, § 386, subd. e.

ing, except the $26,312,000 apportioned to Minnesota as aforesaid, went into the construction of the lines of road beyond this state, and that the proceeds of the bonds so apportioned to the lines beyond the state were equal to the face of the bonds. But, as we shall hereafter show, the proceeds of such bonds which went into the construction of the lines beyond the state must be held, on the evidence, to be about $17,750,000 less than the face of the bonds. This is a very large discrepancy, which renders wholly worthless the estimates of these witnesses as to the amount of fixed charges which the parts of the lines beyond the state should bear. Then the railway company did not maintain the burden of proof placed upon it by the statute, and show to what extent, if any, a division of the gross earnings on such through business on the mileage basis was unfair and inequitable.

The railway company must prove every fact necessary to make out its case. It did not prove what its rates were beyond the line of the state, or that the rates fixed by the commission were comparatively lower than the rates on through business, or comparatively lower than the rates on local business outside of this state. It offered evidence tending to prove the cost of reproducing the part of the roads in Minnesota, but it offered no direct evidence tending to prove the cost of reproducing the parts of the roads outside of this state. Neither have we any light as to the original cost of the latter, except what may be gathered from the amount of bonds issued, and the estimates of the witnesses of the railway company as to the amount of these bonds which should be apportioned to the part of the lines in Minnesota. But it appears from the evidence that considerable of the proceeds of the rest of these bonds went into other enterprises fostered by the railway company.

12. As before stated, the total amount of bonds issued was, in round numbers, $84,000,000; the amount so apportioned to Minnesota, $26,000,000; the Manitoba Company sold $5,000,000 of stock for cash at par; and its stockholders paid into its treasury in cash $10,000,000 more when the lease was made to the Great Northern Company; and all of the proceeds of these transactions went into the construction of said leased lines of railroad, and the fostering

of said other enterprises. But the evidence does not show very clearly how much went into each. We shall now state some of these transactions more in detail.

Of the $84,000,000 or more of bonds now outstanding, $7,805,000, known as "Montana Extension Bonds," are a lien only on that part of the road in Montana, and $28,848,484, known as "Pacific Extension Bonds," are a first lien only on that part of the road west of Montana. Both series are 4 per cent. 50-year bonds, and Vice President Clough testified that they were sold at about 80 cents on the dollar, so that they would net 5 per cent. interest per annum. To net 5 per cent. interest per annum for the 50 years, they should be sold for $81\frac{1}{2}$ cents on the dollar, and their proceeds would be $6,780,-894 less than the face of the bonds. Therefore that much less went into the construction of the road. It is easy to understand why these bonds, secured only by a mortgage on sections of this road running through this undeveloped country, would have to be sold at such a discount. But if these bonds were not at the time adequately secured, so that they could be floated at such reasonably low rates of interest as bonds adequately secured might be, the loss resulting from the transaction should be borne by some one else than the patrons of the road. But in any event the cost of constructing or reproducing the road must be that much less, and for the purpose of this case this $6\frac{3}{4}$ millions (nearly) should be thrown out in ascertaining the amount of capital invested in this road.

It will be remembered that after the foreclosure sales of 1879 the Manitoba Company issued to its promoters $15,000,000 of its stock. Some time afterwards it issued $5,000,000 more, which was sold for cash at par. The manner in which the $10,000,000 was paid by the stockholders of the Manitoba Company into its treasury at the time of the lease as aforesaid is well stated by the court in its findings of fact as follows:

"At the time of the lease of its road by the Manitoba Company to the Great Northern Company, in 1890, a large amount of miscellaneous property was sold and transferred by said Manitoba Company to said Great Northern Company. Said properties consisted of the following items of the agreed value set opposite each, as follows:

### Bonds.

| | |
|---|---:|
| Willmar & Sioux Falls Railway | $2,625,000 00 |
| Duluth, Watertown & Pacific Railway | 1,375,000 00 |
| Montana Central Railway | 500,000 00 |
| St. Paul, Minneapolis & Manitoba Railway, first mortgage bonds | 100 00 |
| St. Paul, Minneapolis & Manitoba Railway, Montana Extension | 6,000 00 |
| Minnesota Transfer Railway | 109,000 00 |
| Todd county | 30,000 00 |
| Town of Hutchinson | 12,000 00 |
| Town of Breckenridge | 4,300 00 |
| County of Pipestone | 30,000 00 |
| Town of Minnesota Falls | 2,000 00 |
| Town of Sandness | 2,000 00 |
| Total | $4,695,400 00 |

### Stocks.

| | |
|---|---:|
| Eastern Railway Company of Minnesota | $ 5,000,000 00 |
| Montana Central Railway Company | 5,000,000 00 |
| Willmar & Sioux Falls Railway Company | 1,500,000 00 |
| Duluth, Watertown & Pacific | 730,000 00 |
| Northern Steamship Company | 1,500,000 00 |
| Minneapolis Union Railway Company | 500,000 00 |
| St. Paul Union Depot Company | 70,000 00 |
| Minnesota Transfer Company | 7,000 00 |
| St. Paul, Minneapolis & Manitoba Railway Company | 5,600 00 |
| Sand Coulee Coal Company | 250,000 00 |
| Climax Coal Company | 149,000 00 |
| St. Paul Foundry Company | 75,000 00 |
| Ft. Benton Bridge Company | 11,600 00 |
| Lake Superior Terminal Railway Company | 16,700 00 |
| Total | $14,814,900 00 |

### Other Properties.

| | |
|---|---:|
| Land Contracts | $621,771 93 |
| St. Anthony Elevator | 39,382 83 |
| Hotel Lafayette | 207,075 22 |
| Minnetonka Beach Lands | 75,202 71 |
| Pine Lands, Mille Lacs County | 53,503 56 |
| Devils Lake Town Site | 23,361 90 |
| Sundry town sites | 5,000 00 |
| St. Paul, Minneapolis & Manitoba Company bonds | 750,000 00 |
| Land grant, St. Cloud to Hinckley | 553,525 74 |
| Total | $2,328,823 89 |

"Said properties so transferred were of the aggregate value of $21,839,123.89, and were paid for by the Great Northern Company by its stock then issued, to the amount of $20,000,000, in the man-

69 M.—26

ner following, as shown by the reports to the commissioners in evidence: The properties so transferred as aforesaid were subject to a lien of $9,250,000. The stockholders of the Manitoba Company paid to the Great Northern Company $10,000,000 in cash, and transferred to it said properties as aforesaid. The Great Northern Company assumed and paid said lien of $9,250,000, and thereupon issued to said stockholders of the Manitoba Company $20,000,000 of Great Northern stock; each stockholder of the Manitoba Company being given a share of the stock of the Great Northern Company for each share that he held in the Manitoba."

Because the Great Northern Company paid for these properties with $20,000,000 of its stock, the court below held that these properties and the income from the same must be excluded from consideration in this case; that, for the purposes of this case, these properties, and the income from the same, must be set aside and appropriated exclusively to the payment of dividends on these $20,000,000 of Great Northern Company stock, and that at the same time the road operated by the Great Northern Company in its own name must earn enough to pay all of the interest on all of these $84,000,000 of bonds, and all of the other fixed charges on this road; and, because it would fail to do so under the rates fixed by the commission, these rates are confiscatory.

This is clearly error. For the purposes of this case, said $20,000,000 of Great Northern Railway Company stock represent only $10,000,000 paid in. The rest is water. These other properties above enumerated not only represent these $10,000,000, but, as we have seen, they must also represent over $11,000,000 more of the proceeds of these $84,000,000 of bonds issued by the Manitoba Company, with which proceeds these properties were originally acquired, and yet the interest on all of these bonds is charged up against the earnings of the Great Northern Railway Company's road. Then, if the position of the court below is correct, the stockholders of the Manitoba Company have succeeded in taking out over $11,000,000 of its capital, on which the road must still earn an income. If these other properties are to be thus excluded, the $10,000,000 paid for the $20,000,000 of Great Northern Railway Company stock must also be excluded, and about $11,000,000 more must be deducted from said $84,000,000 of bonds. Perhaps, with the data which has

now been given, we can approximate the original cost of the parts
of these roads outside of this state.

Of the $84,000,000 of bonds outstanding, the witnesses of the
   railway company apportion to the part of the road in this state.. $26,312,000
Discount on Montana Ext. and Pac. Ext. bonds.................  6,780,849
Bonds, the proceeds of which acquired said other properties...... 11,000,000

    Total...... .............. ................................ $44,092,849

Deducting this from $84,558,484, the total amount of bonds out-
standing, we have $40,465,635 as the total amount of the proceeds
of these bonds invested in the construction of the parts of these
lines outside of this state.   Add to this the $5,000,000 in cash paid
for said $5,000,000 of Manitoba stock, and we have:

As the total approximate cost of the parts of these lines outside of
   this state........ .............. .......................... $45,465,635
Cost of reproducing road in this state.........................  44,000,000

    Total cost of road....................................... $89,465,635

Of this total, $14,000,000 is the cost of reproducing the terminals
in St. Paul and Minneapolis, and $2\frac{1}{2}$ per cent. per annum is, as we
have seen, a liberal income on the same.   On the other $75\frac{1}{2}$ millions
(nearly), 5 per cent. per annum is, in these times, a liberal income.

5 per cent. of $75,500,000........................................ $3,775,000
$2\frac{1}{2}$ per cent. of $14,000,000. ...................................    350,000

    Total reasonable income.................................. $4,125,000

Let us now ascertain what amount of income the whole road pro-
duced in 1894.   The Great Northern Railway Company reported for
the fiscal year of 1894 as follows:

Total gross earnings for entire road, not including other
   revenue........ .............................. ................ $11,385,770 96
Total operating expenses............................;........  6,488,779 21

    Net earnings for the year from the operation of the road... $ 4,896,991 75
Miscellaneous income arising from lease of terminals and parts
   of road, interest, exchange, etc.............................    773,297 54

                                          $ 5,670,289 29

From this must be deducted:

| | | |
|---|---:|---:|
| Interest on separate debt of Great Northern Company......... $ | 600,000 | 00 |
| Rentals paid to other companies than the Manitoba Railway Company.............. ............. ............. | 285,005 | 99 |
| Taxes....... ......................... ....................... | 411,942 | 83 |
| Total............... ......................... ......... $ | 1,296,948 | 82 |
| From said total income of.................................. $ | 5,670,289 | 29 |
| Deduct said sum of...................................... | ·1,296,948 | 82 |
| And we have, total net income........................... $ | 4,373,340 | 47 |
| Reduction which the rates fixed by the commission would cause | 248,992 | 00 |
| Total net income under rates as so fixed................. $ | 4,124,348 | 47 |

This, it will be observed, is but a few hundred dollars less than the above estimate of what, under the circumstances, would be a liberal income in 1894 from the whole of these leased lines, and, in our opinion, is neither an unreasonable nor a confiscatory income. In the above computation we have assumed, without proof, that the interest on the separate debt of the Great Northern Railway Company is but reasonable income on capital acquired by incurring such debt, and invested in the road after the making of said lease. If so, it is a proper charge to be deducted from the net earnings, in determining the amount of the net income. But, for the purposes of this case, there is no difference in principle between this interest and interest on the debts of the Manitoba Company which the Great Northern Company agreed to pay as rent. If the amount of such fixed charges exceed the amount of what is a reasonable income on the cost of reproducing the road, the patrons of the road should not be required to pay the excess.

13. But there are still other reasons why the railway company did not maintain the burden of proof cast upon it by the statute, and which would be cast upon it without the aid of any statute. For the purpose of showing that the rates fixed by the commission are confiscatory, the railway company has presented to the court only a part of its entire railway system. Portions of this system have been separately incorporated, but the whole is under one management, and is in fact managed as one entire system. The stocks

of these other separately incorporated portions are all, or nearly all, owned by the Great Northern Railway Company. Not only is this so, but it appears from the testimony of Vice President Clough that the stocks of some, if not of all, of these separate corporations, have been placed in the hands of the trustees for the purpose of preserving the integrity of the whole system. There are also some other incorporated enterprises whose stocks are owned by the Great Northern Company. These stocks are all enumerated in the portion of the court's findings last above quoted. We will now proceed on the assumption that, for the purposes of this case, the Great Northern Railway Company has a right thus to divide up its entire system. It appears from the report of the Great Northern Company to the railroad commission for the fiscal year of 1894 (in evidence in this case) that some of these stocks earned some very large dividends in that year. The following is taken from one of the tables in that report:

## Stocks Owned.

| NAME. | TOTAL PAR VALUE. | RATE. | INCOME OR DIVIDEND RECEIVED. | VALUATION. |
|---|---|---|---|---|
| Eastern Railway Co. of Minnesota.... | $5,000,000 | 8 % | $400,000 | $5,000,000 |
| Willmar & Sioux Falls Railway Co.... | 1,500,000 | 10 % | 150,000 | 1,500,000 |
| Northern Steamship Co.............. | 1,500,000 | 10 % | 150,000 | 1,500,000 |
| Minneapolis Union Railway Co....... | 500,000 | 15 % | 75,000 | 500,000 |
| Sand Coulee Coal Co................ | 250,000 | | 300,000 | 250,000 |

Besides declaring these dividends, the Eastern Railway Company of Minnesota paid 5 per cent. interest on $4,700,000 of bonds issued by it, and the Willmar & Sioux Falls Railway Company paid 5 per cent. interest on $3,625,000 of bonds issued by it. None of these bonds are now held by the Great Northern Company. The Northern Steamship Company connects with the Great Northern Railway system at its terminus at West Superior, Wisconsin, and carries freight and passengers from that point eastward over the Great Lakes as far as Buffalo, New York. The Sand Coulee Coal Company furnishes a large portion of the coal consumed in operating

the lines of the Great Northern Railway Company, and the balance of the coal produced by its mines is distributed by the railway company to consumers along its lines.

These separate corporations are all controlled absolutely by the Great Northern Company, and the amount of the profits of each depends almost wholly on the character of its dealings with the Great Northern Company, and is in fact a mere matter of book-keeping, in which the officers of the latter company divide the joint profits as they see fit. But, so far as the rights of the patrons of the railroad may be prejudiced by any such division, they are not bound by it. When the two contracting parties are in fact one, so that the one party is merely dealing with himself, the rights of third parties cannot be concluded by such dealing. And when a party deals with himself in such a case the burden is on him to show that the transaction is a fair and equitable one. The burden was on the Great Northern Railway Company, in this case, to show that the division of profits between it and these other corporations was fair and reasonable, and it failed to offer any evidence on that point. The presumption against it is also heightened by the appearance of things.

Here are some parts of its railway system and some of these other corporations earning as dividends from 8 to 120 per cent. per annum, and no explanation is given. It is highly commendable, in the management of this system, that it organized all of these profitable enterprises for the benefit of all of its stockholders, and not for the benefit of the managers and their favorites, as has been done by railway managers in so many other instances. But the fact that it has organized for the benefit of its stockholders all these profitable side enterprises which feed off this railroad system does not change the presumption as between it and the public, or show that it has been equally fair and disinterested towards the patrons of the road. Here, for instance, is the Willmar & Sioux Falls branch, which is a mere feeder of one of the main lines, earning in these dull times a dividend of ten per cent. above the interest on its bonds, while, as the railway company claims, the main line is earning no dividend at all, or scarcely any. The division of profits in this in-

stance may be fair and reasonable, but it will certainly take evidence to prove that it is.

It may be a question whether this entire railway system should be thus divided up at all.   As appears by the court's findings above quoted, there are a number of other separate railroad corporations whose stocks are owned by the Great Northern Company.   The railroad properties of most of these other companies are a part of the Great Northern system.   A fair dividend was declared on the stocks of some of these companies, and none at all on the stocks of others.   It may,be that this whole railroad system is tied together for better and for worse; that it is immaterial how the management has apportioned the profits between the different parts of the system, and that, for the purpose of determining whether rates fixed by one state are confiscatory, the only division that can be made of the whole system is into the portion which is self-supporting and the portions which are not self-supporting, as before stated; and that, after rejecting the latter portions, it only remains to be determined whether the rates thus fixed by the state are comparatively lower than the rates beyond the state, so that a like reduction of the latter rates to the same comparative level would result in such a deficiency of income as to be confiscatory.   On these points we shall express no opinion.   But, unless substance is sacrificed to form, it may be that the separately incorporated portions of this railway system should not, for the purposes of such a case as this, be regarded as separate railroads.

But even if these separately incorporated portions must be regarded as one railroad, or a single system, it is still a question whether the plant of the Northern Steamship Company should be regarded as a part of that system, and it is still more doubtful whether the mines or plant of the Sand Coulee Coal Company should be so regarded; and, if these plants should not be considered a part of the railway system, the Great Northern Railway Company would not have to put into the common pot in this case such profits of those two concerns as result from a just and equitable division of profits between the railway system and each of these other plants.

But the burden would still be on the railway company in this case to show that it has made such a just and equitable division of such

profits, and, as before stated, it has failed to maintain that burden. The presumption against the Great Northern Company on this point is further strengthened by the fact that all of its revenues in 1894 from all its properties were such that they only lacked $104,153.68 of paying all of the fixed charges for that year, including the 6 per cent. dividend on the $20,000,000 of Manitoba stock, and paying also a dividend of $1,187,500 on the stock of the Great Northern Company. The deficiency was taken from the surplus of over $3,500,000 on hand, accumulated from the revenues of former years. This appears by the "income account" of the Great Northern Company in its said report for 1894, which is as follows:

| | | |
|---|---:|---:|
| Gross earnings from operation | $11,385,770 | 96 |
| Less operating expenses | 6,488,779 | 21 |
| Income from operation | $ 4,896,991 | 75 |
| Dividends on stocks owned | $ 1,084,607 | 25 |
| Interest on bonds owned | 133,197 | 49 |
| Miscellaneous income, less expenses | 733,297 | 57 |
| | $ 1,951,102 | 31 |
| Total income | $ 6,848,094 | 06 |

### Deductions from Income.

| | | |
|---|---:|---:|
| Interest on funded debt accrued (separate debt of Gt. N. Ry. Co.) | $   600,000 | 00 |
| Rents paid for lease of road | 4,752,804 | 91 |
| Taxes | 411,942 | 83 |
| Total deductions from income | $ 5,764,747 | 74 |
| Net income | $ 1,083,346 | 32 |
| Dividends 5 per cent. preferred (Gt. N.) stock | $ 1,187,500 | 00 |
| Deficit from operations of year ending June 30, 1894 | $   104,153 | 68 |
| Surplus on June 30, 1893 (from "General Balance Sheet," 1893 report) | $ 3,527,956 | 82 |
| Surplus on June 30, 1894 (for entry on general balance sheet) | $ 3,423,803 | 14 |

Then, from every view that can be taken of this case, it must be held that the railway company failed to maintain the burden of proof that was upon it, and show that the rates complained of are confiscatory. In said report of the dividend declared by the Sand Coulee Coal Company in 1894 is a note stating that this dividend

of $300,000 was "paid out of the profits of the Sand Coulee Coal Co. for the last four years." We do not ,see that this fact, standing alone, changes any presumption in this case, or raises a presumption that it had not declared large dividends in prior years. It is also claimed that a considerable portion of the profits of the Great Northern Company for years prior to 1894 were invested in the different properties, instead of being distributed among its stockholders, but the amount of the profits so invested does not appear. We do not see that these facts should have any very controlling influence in the result of this case. If the Great Northern Company has made such large profits in the past that it was able to pay very large dividends, and still accumulate such large amounts of surplus to invest in its properties, or to carry along for several years, it should be content to get along with smaller profits in such times of financial stringency as existed in 1894. Then, from any view that can be taken of the case, it must be held that the railway company failed to maintain the burden of proof that was upon it, and show that the rates complained of were confiscatory.

We are of the opinion that, therefore, the order appealed from should be reversed, and a new trial granted. It is so ordered.

BUCK, J.

I concur in the result.

MITCHELL, J.

I concur in the result arrived at in the foregoing opinion, and in most of the grounds upon which it is based; but, in view of the importance of the case, I wish to emphasize a few principles which I think should govern this class of cases in the courts. I will do this in the form of a statement of certain propositions, without entering into any extended argument in their support:

1. It must now be accepted as the settled law that, when rates of charges by railway companies have been fixed by the legislature or a commission, the determination of the question whether such rates are "reasonable" or "unreasonable" is a judicial function. But this is so, not because the fixing of rates is a judicial function (for all the authorities agree that it is a legislative one), but solely by virtue of the constitutional guaranty that no one shall be de-

prived of his property without due process of law.  Therefore the only function of the courts is to determine whether the rates fixed violate this constitutional principle.

Courts should be very slow to interfere with the deliberate judgment of the legislature or a legislative commission in the exercise of what is confessedly a legislative or administrative function.  To warrant such interference, it should clearly appear that the rates fixed are so grossly inadequate as to be confiscatory, and hence in violation of the constitution.  It is not enough to justify a court in holding a rate "unreasonable," and hence unconstitutional, that, if it was its province to fix rates, it would, in its judgment, have fixed them somewhat higher.  Any such doctrine would result, in effect, in transferring the power of fixing rates from the legislature to the courts, and making it a judicial, and not a legislative, function.  When there is room for a reasonable difference of opinion, in the exercise of an honest and intelligent judgment, as to the reasonableness of a rate, the courts have no right to set up their judgment against that of the legislature or of a legislative commission.  In my opinion, it is only when a rate is manifestly so grossly inadequate that it could not have been fixed in the exercise of an honest and intelligent judgment that the courts have any right to declare it to be confiscatory.  This seems to be substantially the doctrine suggested in Spring v. Schottler, 110 U. S. 347–354, 4 Sup. Ct. 48, which, so far as I can discover, is the first case in which that court sugested any modification or limitation of the doctrine of the so-called "Granger Cases."   And I think it is the doctrine which the courts must finally settle down on, unless they are prepared to assume the function of themselves fixing rates.

2. What is a reasonable rate is a most difficult question, and it is doubtful whether any single rule for determining it can be laid down that would be complete, and alike applicable to all cases. But as good a general rule as I have found is that stated by counsel for the Northern Pacific Railway Company in this case, to wit:

"If a railroad is built and operated wisely and economically; if it is located where public need requires it, where there is business to justify its existence, and constructed so as to be fit and well adapted for the business which it aims to accommodate,—it should

be entitled to return as good interest [on the cost of the reproduction of the road] as capital invested in the average of other lines of enterprise."

It seems to me that it follows, as corollaries from this rule, that— First, the cost of reproduction must be estimated on a present cash basis, and that it can make no difference whether a road was originally built with cash capital paid in by the stockholders, or with borrowed money secured by mortgage on the property; and, second, a rate may be reasonable during times of general financial and business depression, when capital invested in all lines of enterprise is yielding a small return, which would be unreasonable in prosperous times, when capital invested in business enterprises is yielding a much larger return. There is no constitutional principle which guaranties the capital invested in railroads immunity from business vicissitudes to which capital invested in all other enterprises is subject. These propositions are fully discussed in the opinion. The courts should take notice of the general depression in business prevailing in 1894.

3. Where capital (including labor) invested in the production of any article or commodity is comparatively unremunerative, yielding but a small return, a rate for the transportation of such article or commodity may be reasonable, although, if the carrier was required to do all his business at rates fixed on a corresponding basis, such rates would be unreasonable, to the extent of being confiscatory. This is but an enlarged application of a principle already suggested. It is a principle upon which railroads themselves act every day in fixing rates, recognizing as they do that rates are largely dependent upon competition among producers or shippers. Of course, this proposition has its limitations, but it is unnecessary to discuss them here. The courts, I think, should take notice of the small profit in raising grain in Minnesota in and about 1894, owing to the comparatively low prices then prevailing.

I will not go into any discussion of the evidence, or any analysis of the labyrinth of figures and estimates presented in the testimony. That has been very exhaustively, and, as I think, correctly, done by Justice CANTY. Applying the rules I have suggested to the evidence, I do not think any court would be justified in holding that

the railroad company has satisfactorily proved that the rates fixed by the commission for the transportation of grain are "unreasonable"; that is, if enforced, they would be confiscatory.

Two propositions, however, are advanced in the foregoing opinion, to the entire correctness of which I do not care to commit myself. I refer to the propositions—First, that a railway company is entitled to a much less percentage on the value of its terminals than it is on the cost of reproducing the rest of its road; and, second, that, in determining what are reasonable rates on the rest of a line or system of railway, a state has a right to reject from the calculation such portions of the line or system as are not self-supporting. While it is doubtless true that, rightly understood and rightly applied, there is at least an element of truth in both of these propositions, yet they open up such a vast and difficult field for discussion, and would, at best, be subject to so many limitations and qualifications, depending upon the facts and circumstances of each particular case, that I do not now wish either to affirm or deny the correctness of what is said on those points, especially as they are not discussed by counsel, and are not, in my judgment, necessary to the determination of the present case.

COLLINS, J.

I concur in the conclusion reached in the foregoing opinion, but will state my views upon some matters not specially referred to by Justice CANTY.

The complaint herein was filed under the provisions of subdivision e, § 8, c. 10, Laws 1887, as amended by Laws 1891, c. 106, § 1. This subdivision provides for such filing, the giving of notice to the common carrier, and a hearing before the commission, if the carrier refuses or neglects to change its tariff of rates as demanded in the complaint. After a hearing or investigation the commission makes its report to both complainant and carrier, and, if it finds by the evidence that the tariff of rates complained of is unequal or unreasonable, the "commission shall state wherein they are unequal or unreasonable, and shall make a tariff of rates, fares, charges and classifications which shall be substituted for the tariff complained of." It is then provided that—

"Such tariff of rates, fares, charges or classifications, so made by the commission, shall be deemed and taken in all courts of this state as prima facie evidence that the tariff of rates, fares, charges or classifications so made is equal and reasonable, and such tariff so made shall be in full force and effect during the pendency of any appeal that may be taken in the matter to the courts." [7]

Here we find that by legislative enactment an order of the commission fixing and prescribing a tariff of rates must be deemed and taken, in all of the courts in our state, as prima facie evidence that the tariff so fixed and prescribed is equal and reasonable; the onus being thus cast upon the appealing carrier, in all of our legal tribunals and in all proceedings, to show that it is not. The burden of proof was therefore upon this respondent carrier to overcome the prima facie case presented in the court below by means of the order of the commission. And this burden rested upon the carrier at every stage of the trial, and in respect to all matters affecting its earning capacity, its sources of revenue, its operating expenses, the fixed charges, and the value of the investment.

The question then arising is whether, in all respects, the evidence justified and warranted the finding, in effect, that the tariff rates fixed by the order of the commission upon wheat, oats, barley, rye, and corn, and the mill products of these grains, were so unjust and unreasonable as to be confiscatory in their nature, and, when enforced, to operate as a practical destruction of the rights of property. The court below found that the tariff rates charged by respondent on grain prior to the order in controversy, which reduced the rates on the kinds of grain mentioned, and their mill products, about ten per cent., were low in comparison with rates on other classes of traffic; and it also found, should the rates complained of be reduced as ordered, that

"The evidence fails to show that there is any class of traffic in this state upon which the rates can be reasonably increased to make good the amount of such reduction."

The finding that the rates complained of were low in comparison with rates on other classes of traffic, admitting that this find-

[7] G. S. 1894, § 386, subd. e.

ing was supported by the evidence, does not tend to support the decision ultimately reached, that the rates fixed in the order were unjust and unreasonable; for the rates on other classes of traffic, when compared with rates on grain, might be much below what would be a just and reasonable compensation to the carrier. Nor would it follow from the fact that, by comparison, grain rates were lower than rates upon other commodities, that the rates upon these commodities could not be advanced so as to relieve grain from part of the cost of transportation, if sound business principles justified, or justice to the public demanded, such action. And when making the finding that the evidence failed to show that there was any class of traffic upon which the rates could reasonably be increased so as to make good the loss to the carrier arising from the reduction of revenues caused by the order, the court seems to have disregarded the rule that the burden of proof was on the respondent to show that the rates upon some other, or all other, classes of traffic, could not be raised so as to cover the reduction, and make good any decrease in its revenues growing out of the operation of the order, and to have overlooked the important fact that it was not incumbent upon the complainant to show by a preponderance of evidence that the carrier's loss by reason of the reduction of tariff rates upon the grains mentioned in the order could be made good by increasing, without injustice to any one, the tariff rates upon other classes of traffic.

It is well known that, in the business of transportation, common carriers are continually applying principles which are forced upon them by reason of peculiar conditions and situations. Competition between carriers and producers brings about these conditions and situations, and the result is that arbitrary rules must yield to hard, unyielding facts. Because of this the rate for carrying any particular commodity cannot always be regulated and governed by comparison with the rates fixed for other articles. These rules compel what appears at first glance to be discrimination between commodities. That this is an everyday practice with carriers, and that it is well known and justified in business circles, and is tolerated and approved because of the necessity, cannot be overlooked by the courts any more than it is by legislatures or by commission-

ers, or by the carriers themselves, when making schedules of rates for the transportation of either passengers or merchandise. And if this business policy actuates and influences the carriers themselves to disregard a rule of strict comparison and strict equality, as between bulk or weight or value of the various commodities, and to carry one article many more miles for the same money than they do another, although there may be no substantial difference in bulk or weight, or otherwise, between these two articles, and this is approved by the public as good business policy under the circumstances, there is no reason why the legislature or the commission should not be actuated, influenced, and governed by the same rule. And there is no reason why the courts should not heed and act upon it when called upon to consider and review an order of the character of the one at bar.

No better rule for the government of a public commission or a court when investigating rates can be adopted than one applied by the railroads themselves,—a rule which will so adjust rates as to secure the largest interchange of commodities; a rule which will stimulate, encourage, and induce the movement of any commodity which can be produced in any section of the country in large quantities. Of course, such rates should not be established so low as to impose an unreasonable burden on other traffic, but should be fixed "so as to have reasonable relation to the cost of production, and the value of the transportation service to the producer and shipper." The rule I speak of as being constantly recognized and acted upon by railroads has often been referred to and countenanced by the interstate commerce commission when considering the question of long and short hauls. In re Louisville, 1 Inters. Com. 31; Thurber v. New York, 3 Inters. Com. 473; Lehmann v. Southern, 4 Inters. Com. 1; Warner v. New York, Id. 32; In re Excessive Freight Rates, Id. 48. In fact, the rule which permits a greater rate per mile on the short haul than is charged upon the long is based upon the same principle as that which allows a greater rate to be charged upon certain classes of freight than upon other classes, where there is no material difference in weight, bulk, value, or cost of transportation, and is justified by the same argument.

I am of the opinion that evidence should have been introduced

in this case which would have supported a finding to the effect that there was no class of traffic in the state upon which rates could have been reasonably increased or fixed so as to make good the amount of reduction upon the articles mentioned in the order appealed from, and that without such a finding of fact the conclusion of the court below reversing the order of the commission was erroneous.

I see no reason for holding, as claimed by the appellants, that the court below erred in receiving the evidence tendered by the Northern Pacific Railway Company, or that it erred in basing its order of reversal upon the condition of the affairs of that road as shown by the evidence, if it was so based. I am of the opinion that the learned trial court adhered very closely upon the hearing to what was said in this case when it was here before upon this subject.[8]

I do not quite understand what was meant by the court below when it used the following language in its eighteenth finding of fact:

"The order appealed from does not constitute a tariff. It cannot be published as a tariff. It simply fixes the maximum rates upon the mileage basis."

I think, when examining Schedule A, in which the rate in cents per 100 pounds for various distances, commencing with 4 cents per 100 for 5 miles and under, and increasing for every 5 miles until the rate for 400 miles was fixed at 16.7 per 100, the court overlooked the order, for that concluded as follows:

"It is therefore ordered that the tariff rates and charges on the above-mentioned articles be reduced, and fixed at the rates shown in said Schedule A."

This was a fixing of the tariff rates by the commission, although it is quite possible that a schedule of rates based thereon would have to be prepared by the carrier for the use and guidance of its employees. The order must be regarded as a tariff of rates upon a mileage basis between the points mentioned in the complaint. It is not operative elsewhere, although in terms it may be broad enough

[8] 60 Minn. 461.

to cover the entire line of road owned or operated by the Great Northern Company.

If, by the fourth subdivision of the main opinion, this court means to hold that the district court can, upon appeal from an order fixing a tariff of rates made by the commission, determine what the rates should be, when unable to affirm the order, I 'must dissent. I am of the opinion that the court below did not err when it refused to find a just and reasonable freight rate for the commodities mentioned in the order, and when it held that it is without the purview of a court of law to determine the question. The claim of the appellant on this point is that power to find, fix, and determine what are reasonable rates is conferred by the statute which authorizes the court on appeal to affirm, modify, or reverse the order, in whole or in part, as justice may require. Laws 1891, c. 106, § 3, subd. d.[9]

The fixing of rates is a legislative or administrative function. It is not a judicial question, except as judicial power may be invoked and used to prevent and restrain an abuse of legislative or administrative authority, by the exercise of which a rate unreasonably low, and confiscatory in fact, has been established. When we consider that the commission has power to make many orders which do not affect or fix rates, but which are appealable, and may be modified by the courts, I am obliged to hold that the word "modify" comprises "only those modifications which would be an exercise of judicial power, and as not including modification essentially involving an exercise of legislative or administrative power." Thus construing the word, we can give it an effect which harmonizes the section in which it is found with what was said in Reagan v. Farmers, 154 U. S. 362, 14 Sup. Ct. 1047, as follows:

"Courts are not authorized to revise or change the body of rates imposed by a legislature or a commission; they do not determine whether one rate is preferable to another, or what, under all circumstances, would be fair and reasonable as between the carriers and the shippers. They do not engage in any mere administrative work; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or commission is unjust and unreasonable, and such as to work a prac-

[9] G. S. 1894, § 393, subd. d.

tical destruction to rights of property, and if found to be so, to restrain its operation."

Commenting on this and other cases, the circuit court remarked in Chicago v. Dey, 38 Fed. 656, 663:

"It would be strange, indeed, after the various adjudications of the supreme court, if any court should assume to prescribe a schedule of rates."

It has been invariably held that courts are without authority to change rate tariffs, when fixed by either legislature or commission. I see nothing in our statute which suggests that the well-settled rule should be departed from.